BISSELL v. THE MICHIGAN SOUTHERN AND NORTHERN INDIANA RAILROAD COMPANIES.

Where two corporations, chartered respectively by the States of Michigan and Indiana, with power to each to build and operate a railroad within its own State, have united in the business of transporting passengers over a third road in the State of Illinois, beyond the limits authorized by the charter of either, such corporations are jointly liable for injuries to a passenger resulting from the negligence of their employees.

The following propositions were discussed, but not passed upon, by the court, viz.:

Corporations, like natural persons, have power and capacity to do wrong. They may, in their contracts and dealings, break over the restraints imposed upon them by their charters; and when they do so, their exemption from liability cannot be claimed on the mere ground that they have no attributes or faculties which render it possible for them thus to act. *Per* COMSTOCK, Ch. J.; SELDEN, J., concurring.

Corporations have no right to violate their charters, but they have capacity to do so, and to be bound by their acts where a repudiation of such acts would result in manifest wrong to innocent parties. *Per* COMSTOCK, Ch. J.

Bissell *v.* The Michigan Southern and Northern Indiana Railroad Companies.

A corporation is more than an agent of the shareholders. Such bodies are clothed with the legal title to the property or funds which represent the capital, in trust, however, for the shareholders, who are the beneficial owners; and, like other trustees, it is possible for them to deal with the capital in a manner and for purposes not authorized by their charters, and to be bound by such dealings. *Per* Comstock, Ch. J.

The plea of *ultra vires*, according to its just meaning, imports, not that the corporation could not, and did not in fact, make the unauthorized contract, but that it ought not to have made it. Such a defence, therefore, necessarily rests upon the violation of trust or duty toward the shareholders, and is not to be entertained where its allowance will do a greater wrong to innocent third parties. The acquiescence of the shareholders in the abuse will prevent the interposition of such a plea. *Per* Comstock, Ch. J.

When corporations abuse their powers, the State may interpose and reclaim their charters. So a threatened abuse may be arrested by the courts at the suit of the shareholders. So, also, the shareholders may recover their damages against the officers and agents who have diverted the capital to improper purposes. *Per* Comstock, Ch. J.

Where a corporation has received the consideration of its unauthorized contract, and a restitution will not do complete justice, the remedy of the other party is not confined to a suit in disaffirmance of such contract, but may be directly upon it. So, the contract will be enforced under any circumstances of controlling equity. *Per* Comstock, Ch. J.

The contracts of corporations, made in excess of their rightful powers, but free from any other vice, are not illegal in the sense of the maxim, *ex turpi causa*, &c. The illegality of a contract in that sense is determined by its quality, and does not depend on the person or being which makes it. *Per* Comstock, Ch. J.

The powers and privileges of corporations are conferred, not for the private convenience of the corporators, but for public purposes and to promote the public interest. They are granted at the expense of the public, since they create advantages which persons unincorporated do not possess. The public benefit is treated as a compensation for the grant; and it would be an abuse of legislative power to make the grant except in contemplation of such a benefit. *Per* Selden, J.

The legislature, in conferring corporate power, is presumed, in every instance, to have carefully considered the public interest, and to have granted just so much power as that interest requires. *Per* Selden, J.

If corporations are permitted to usurp powers not granted, it is done at the expense of the public. Sound policy, therefore, demands that they should be kept strictly within their chartered limits; and every contract made by them which exceeds those limits, like all other contracts in contravention of public policy, is illegal, and therefore void. *Per* Selden, J.

Bissell *v.* The Michigan Southern and Northern Indiana Railroad Companies.

It is a good defence to a corporation, when sued upon a contract, that, in making such contract, it exceeded its corporate powers: this defence being allowed, not for the sake of the corporators, but for that of the public. The corporation would, however, be estopped from setting up the defence, in a case where the other party to the contract could not be presumed to be cognizant of the excess of power. *Per* SELDEN, J.

Although corporations cannot rightfully do any acts not authorized by their charters, yet such acts, when done by their direction and for their benefit, are to be regarded as corporate acts; and if, in the course of their performance, the agents of the corporation are guilty of negligence, by which others are injured, the corporation is responsible, such liability arising, not from any contract between the parties, but from the duty which every railroad company owes to persons within its cars with its consent and not as trespassers. *Per* SELDEN, J.

APPEAL from the Supreme Court. Action against two distinct railroad corporations for a breach of their duty, safely to convey the plaintiff, a passenger upon a train of cars, which they, by a contract between them, had united in running, and by means of the negligence of their agents suffering a collision with another train, by which the plaintiff's leg was broken. The trial was before referees, who found these facts:

The Michigan Southern Railroad Company was chartered by the State of Michigan to build and operate a railroad through the southern part of Michigan; and the Northern Indiana Railroad Company was chartered by the State of Indiana to build and operate a railroad through the northern part of the State of Indiana. The Southern Michigan Railroad Company built the road through the State of Michigan, and the Northern Indiana Railroad Company built the road through the State of Indiana; and also, in conjunction with another railroad company, they built the railroad from the northern part of the State of Indiana, through a part of the State of Illinois, to the city of Chicago. Previous to the 25th day of April, 1853, the Southern Michigan Railroad Company and the Northern Indiana Railroad Company formed a business connection, under the name of the Michigan Southern and Northern Indiana Railroad Companies, and on or about the 25th day of April, 1853, ran their cars carrying passengers and freight from Lake Erie to Chicago and the intermediate

places, and from Chicago to Lake Erie and the intermediate places, through the States of Ohio, Michigan, Indiana and Illinois. The cars and other property connected with these roads were used by the Michigan Southern and Northern Indiana Railroad Companies jointly, and each shared in the profits and losses. The business of the companies was carried on and transacted under their joint name, and the companies were practically consolidated into one. The defendants, on the 25th day of April, 1853, and at the time this action was brought, had, in the city of New York, in this State, a general office of business, occupied by their president and treasurer, where a large portion of their moneys, funds and other property was kept. On the 25th day of April, 1853, while the defendants were jointly operating these roads, from Chicago to Lake Erie, through the States of Illinois, Indiana, Michigan and Ohio, to Lake Erie, the defendants took into a train of their cars near Chicago, in the State of Illinois, the plaintiff and his baggage, as a passenger therein, to Toledo, for fare and reward. While the plaintiff was on the defendants' cars, and while being conveyed by them eastward on said road, in the State of Illinois, the defendants' cars were run carelessly, at a hazardous speed at the crossing of the Illinois Central Railroad, and the road occupied and run by the defendants; by means whereof the defendants' cars run into and came in collision with a train of cars then running on the Illinois Central Railroad, across the said road owned and occupied by the defendants, and a passenger car of the defendants', which the plaintiff occupied, was broken to pieces, and the plaintiff damaged and injured in his person and property.

The referees reported in the plaintiffs' favor for $2,500, for which judgment was entered; and such judgment having been affirmed at general term in the sixth district, the defendants appealed to this court.

*Charles Tracy*, for the appellants.

*Amasa J. Parker*, for the respondent.

COMSTOCK, Ch. J.  A general statement of the plaintiff's case is, that the two corporations defendant were jointly engaged in the business of carrying passengers and freight between Chicago and Lake Erie, through a part of the State of Illinois, and through the States of Indiana and Michigan, by three connected railroads which they owned or controlled, and the business of which was managed under a consolidated arrangement which had been in force between the defendants for some time previous to the injury complained of; that, being so engaged, they undertook and assumed to carry him, the plaintiff, as a passenger from Chicago, or a point near that place, eastward over the consolidated line of road; that he took his seat in their cars accordingly, and that during the transit he was injured by an accident which happened through their carelessness and neglect.  Assuming the truth of this statement, there is no doubt of the plaintiff's right to recover.  But the defendants deny the legal truth of these facts, because one of the companies was chartered by the legislature of Michigan, with power to build a road in that State, and the other by the legislature of Indiana, with power to build one in that State.  They both insist that they had no right or power under their respective charters to consolidate their business in the manner stated, and especially that they could not legally, either separately or jointly, acquire the possession and use of a connecting road in the State of Illinois and undertake to carry passengers or freight over the same.  They do not deny that their boards of directors and agents, duly authorized to wield all the powers which the corporations themselves possessed, entered into the arrangements which have been mentioned, nor that, in the execution of those arrangements, they made the contract with the plaintiff to carry him as a passenger; nor do they deny that they received the benefit of that contract in the customary fare which he paid.  Their defence is, simply and purely, that they transcended their own powers and violated their own organic laws.  On this ground they insist that their business was not, in judgment of law, consolidated; that they did not use and operate a road in Illinois; that they did not undertake

to carry the plaintiff over it; and did not, by their negligence, cause the injury of which he complains; but that all these acts and proceedings were, in legal contemplation, the acts and proceedings of the natural persons who were actually engaged in promoting the same.

Can then two railroad corporations, having connecting lines, thus unite their business, for the purpose of promoting their common interest: charter another connecting road in further-ance of the same policy: hold themselves out to the public as carriers over the whole route: enter into contracts accordingly: receive the benefit of those contracts; and then, when liabilities arise, interpose the violation of their own charters to shield them from responsibility? Such a defence is shocking to the moral sense, and although it appears to have some support in judicial opinions, I think it has no foundation in the law.

The doctrine has certainly been asserted on some occasions, that, in all cases where the contracts and dealings of a corpo-ration are claimed to be invalid for want of power to enter into the same, a comparison must be instituted between those con-tracts and dealings and the charter, and, if the charter does not appear to embrace them, then that they must be adjudged void to all intents and purposes, and in all conceivable circumstan-ces. The reasoning on which this doctrine has been usually claimed to rest, denies, in effect, that corporations can, or ever do, exceed their powers. They are said to be artificial beings, having certain faculties given to them by law, which faculties are limited to the precise purposes and objects of their creation, and can no more be exerted outside of those purposes and objects than the faculties of a natural person can be exerted in the performance of acts which are not within human power. In this view, these artificial existences are cast in so perfect a mould that transgression and wrong become impossible. The acts and dealings of a corporation, done and transacted in its name and behalf by its board of directors, vested with all its powers, are, unless justified by its charter, according to this reasoning, the acts and dealings of the individuals engaged in them, and for which they alone are responsible. But such,

I apprehend, is not the nature of these bodies. Like natural persons, they can overleap the legal and moral restraints imposed upon them: in other words, they are capable of doing wrong. To say that a corporation has no right to do unauthorized acts, is only to put forth a very plain truism; but to say that such bodies have no power or capacity to err, is to impute to them an excellence which does not belong to any created existences with which we are acquainted. The distinction between power and right is no more to be lost sight of in respect to artificial than in respect to natural persons.

I think this doctrine of theoretical perfection in corporations would convert them practically into most mischievous monsters. A banking institution, through its board of directors, may invest its funds in the purchase of stocks or cotton, and every holder of its stock may acquiesce, expecting to profit by the speculation. If the enterprise is successful, the corporation and its stockholders gain by the result. If a depression occurs in the market, and disaster is threatened, the doctrine that a corporation can never act outside of its charter enables it to say, "this is not our dealing," and the money used in the adventure may be unconditionally reclaimed from whatever parties have received it in exchange for value; while the injured dealer must seek his remedy against agents perhaps irresponsible or unknown. Corporations may thus take all the chances of gain, without incurring the hazards of loss. Familiar maxims of the law must be reversed. In the relation of private principal and agent, the adoption of an agent's unauthorized dealing is equivalent to an original authority; and the adoption is perfect when the principal receives the proceeds of that dealing. Corporations may practically act in the same manner. The proceeds of unauthorized adventures may be received and become blended with their legitimate business and funds so as to be wholly undistinguishable; but, as the adventures themselves were, in judgment of law, impossible, considered as corporate transactions, so they cannot become possible upon any principle of ratification or estoppel. If we say there is an utter absence of power or faculty to engage in the dealing, it

Bissell *v.* The Michigan Southern and Northern Indiana Railroad Companies.

is a self-evident proposition that no rule of estoppel can change the result.

It is not uncommon, in charters of corporations, to lay express prohibitions upon them as a limitation of their powers, having in view the maintenance of some public policy; as, for example, prohibitions relating to the currency of the State. If they violate these prohibitions, they have been supposed to be public offenders, and on that ground the law has always denied to them its remedial processes either in affirmance or disaffirmance of their unlawful contracts; thus regarding them as private offenders are regarded. But this rule of law must be overthrown, if we admit this theory of constitutional inability in corporations to overstep the limits of rightful power. In the case of *The Life and Fire Insurance Company* v. *The Mechanics' Fire Insurance Company* (7 Wend., 31), it was contended that a certain corporate transaction, if unlawful, was to be regarded as the act of the agents or officers of the company, and not of the company, and, therefore, that the company should be allowed to recover back the money or property improperly disposed of. That doctrine was refuted by Mr. Justice SUTHERLAND in this language: "This would be a most convenient distinction for corporations to establish—that every violation of their charter or assumption of unauthorized power on the part of their officers, although with the full approbation of their directors, is to be considered the act of the officers, and is not to prejudice the corporation itself. There would be no possibility of ever convicting a corporation of exceeding its powers and thereby forfeiting its charter, or incurring any other penalty, if this principle could be established." These remarks suggest an unanswerable argument against the doctrine. Why, it may be asked, does the law provide the remedy by *quo warranto* against corporations for usurpation and abuse of power? Is it not the very foundation of that proceeding, that corporations can and do perform acts and usurp franchises beyond the rightful authority conferred by their charters? Most assuredly this is so. The sovereign power of the State interposes,

alleges the excess or abuse, and on that ground demands from the courts a sentence of forfeiture.

One of the sources of error in reasoning upon legal as well as other questions, is, inexactness in the use of language, or, perhaps, in the imperfectness of language, to express the varieties of thought. It is a self-evident truth, that a natural person cannot exceed the powers which belong to his nature. In this proposition, we use words in their literal and exact sense. In the same sense, it is a truth equally evident that a corporation cannot exceed its powers; but this is only asserting that it cannot exercise attributes which it does not possess. As an impersonal being, it cannot experience religious emotion, or feel the moral sentiments. Corporations are said to be clothed with certain powers enumerated in their charters or incidental to those which are enumerated, and it is also said they cannot exceed those powers; therefore, it has been urged that all attempts to do so are simply nugatory. The premises are correct when properly understood; but the conclusion is false, because the premises are misinterpreted. When we speak of the powers of a corporation, the term only expresses the privileges and franchises which are bestowed in the charter; and when we say it cannot exercise other powers, the just meaning of the language is, that as the attempt to do so is without authority of law, the performance of unauthorized acts is a usurpation which may be a wrong to the State, or, perhaps, to the shareholders. But the usurpation is possible. In the same sense, natural persons are under the restraints of law, but they may transgress the law, and when they do so they are responsible for their acts. From this consequence corporations are not, in my judgment, wholly exempt. The privileges and franchises granted are not the whole of a corporation. Every trading corporation aggregate includes an association of persons having a collective will, and a board of directors or other agency in which that will is embodied, and through which it may be exerted in modes of action not expressed in the organic law. Thus, like moral and sentient beings, they

may and do act in opposition to the intention of their creator, and they ought to be accountable for such acts.

A great variety of cases might be supposed, in which this doctrine of corporate exemption from liability could not be defended upon any rule of reason or principle of justice. But perhaps none of them would afford a more persuasive illustration than the one now under consideration. Let us look at the facts and consider the results. These corporations had boards of directors in whom were vested every power, faculty or function which belonged to the bodies they represented We have then no question in the law of agency; for the agents, if that be the proper term, had all the powers of the principals. Indeed, in an important sense, they were the principals; because their authority was not received by delegation from any other principal. These boards proceeded to consoldiate the two lines of road, and they included in the scheme another connecting road. This being done, they entered into all the relations of carriers with the public, and the entire business of both companies was thus conducted for a period of several years, with no complaint on the part of the State sovereignties which granted the charters, and none on the part of the shareholders. All the gains and profits of the business were received to the use of the corporations, and it is to be assumed that the shareholders were benefited thereby. The question arises, where were these companies and what were they doing during all this period? The question would be the same if that mode of conduct were to continue without limit of time. If the acts mentioned were in excess of the powers granted, and if we concede the doctrine that such acts are in all circumstances to be imputed to the agents who perform them, the conclusion follows, that the corporations became virtually extinct by a non-user of their franchises. If the business thus conducted was not the business of the companies, they were engaged in none whatever, and thus, practically, if not legally, ceased to exist. If it was the business of the directors as natural persons, then those persons must be deemed not only to have taken a wrongful possession of all the estate and

funds of the corporations they professed to represent, but also to have usurped their franchises, and to have stolen their corporate names and seals. If this be the legal interpretation of the course of dealing and conduct actually carried on under the acts of incorporation passed by the legislatures of Michigan and Indiana, then the companies might have been proceeded against by those States, not on the ground of a usurpation of powers and privileges which did not belong to them, but for a total non-user of the franchises which did belong to them; while, on the other hand, writs of *quo warranto* might have been issued against the individual directors and agents for usurping corporate rights without any charter at all. (16 Wend., 655; 23 id., 193; 3 Bl. Com., 263.) These conclusions are not founded in any known principle or practice, and they are totally opposed to the facts of the case. In rejecting them, we must also reject the theory of corporate perfection and immunities on which they were based; and we are compelled to hold that those companies, as legal and accountable persons, engaged themselves in the business of carrying passengers and freight under and according to the arrangements which have been mentioned, and thereby placed themselves in that relation to the public, and to the plaintiff in particular, which is the subject of the present controversy.

But the doctrine, that corporations can never be bound by engagements not justified by the grant of power from the State, is next defended on a different ground. Although it be conceded that they are present, and acting as legal persons, or entities, when such engagements are entered into, it is said that all contracts in excess of the rightful power possessed by corporations are illegal and therefore void. This is an argument totally different from the one which has been so far examined, because it necessarily imputes the making of the contract to the corporate person or being; whereas, the doctrine which I have endeavored to refute denies that proposition. The very point of the supposed illegality consists, or at least it may consist, in the performance of acts perfectly lawful in themselves, but which, being done by a corporation, and not by individuals,

are pronounced illegal because they are so done without authority contained in the charter.

But is it true that all contracts of corporations for purposes not embraced in their charters are illegal, in the appropriate sense of that term? This proposition I must deny. Undoubtedly such engagements may have the vices which sometimes infect the contracts of individuals. They may involve a *malum in se* or a *malum prohibitum*, and may be void for any cause which would avoid the contract of a natural person. But where no such vices exist, and the only defect is one of power, the contract cannot be void because it is illegal or immoral. Such a doctrine may have some slight foundation in the earlier English railway cases (*The East Anglian Railway Co.* v. *The Eastern Counties Railway Co.*, 7 Eng. Law and Eq., 509; *McGregor* v. *The Deal and Dover Railway Co.*, 16 id., 180); but it was never established, and is not now received in the English courts. (*The Mayor of Norwich* v. *The Norfolk Railway Co.*, 30 Eng. Law and Eq., 120; *Eastern Counties Railway Co.* v. *Hawkes*, 35 id., 8, 37.) The books are full of cases upon the powers of corporations and the effect of dealing in a manner and for objects not intended in their charters; but with the slight exception named, there is an entire absence, not only of adjudged cases, but of even judicial opinion or dicta, for the proposition that mere want of authority renders a contract illegal. Such a proposition seems to me absurd. The words *ultra vires* and illegality represent totally different and distinct ideas. It is true that a contract may have both those defects, but it may also have one without the other. For example, a bank has no authority to engage, and usually does not engage, in benevolent enterprises. A subscription, made by authority of the board of directors and under the corporate seal, for the building of a church or college or an almshouse, would be clearly *ultra vires*, but it would not be illegal. If every corporator should expressly assent to such an application of the funds, it would still be *ultra vires*, but no wrong would be committed and no public interest violated. So a manufacturing corporation may purchase ground for a school house or a place of

worship for the intellectual, religious and moral improvement of its operatives. It may buy tracts and books of instruction for distribution amongst them. Such dealings are outside of the charter; but, so far from being illegal or wrong, they are in themselves benevolent and praiseworthy. So a church corporation may deal in exchange. This, although *ultra vires,* is not illegal, because dealing in exchange is, in itself, a lawful business, and there is no State policy in restraint of that business.

To illustrate the subject in another manner: An agent may make a contract in the name and behalf of his principal, but not within the scope of his agency. If the consideration and purpose of such a contract be lawful, it may be void as against the principal, but not on the ground of illegality. A corporation is not an agent of the State, or, in any strict sense, of the shareholders. But it derives its powers from the State, and it may transcend those powers for purposes which, in themselves considered, involve no public wrong. Contracts so made may be defective in point of authority, and may contemplate a private wrong to the shareholders; but they are not illegal, because they violate no public interest or policy. My meaning, in short, is that the *illegality* of an act is determined in its quality and does not depend on the person or being which performs it.

There has been, I think, some want of reflection, even in judicial minds, upon the reasons and policy which mainly govern in the granting of charters to corporations, with certain specified powers and no others. A private or trading corporation is essentially a chartered partnership, with or without immunity from personal liability beyond the capital invested, and with certain other convenient attributes which ordinary partnerships do not enjoy. It is also something more than a partnership, because the legal or artificial person becomes vested with the title to all the estate and capital contributed, to be held and used, however, in trust for the shareholders. Now, in a well regulated unincorporated partnership, the articles entered into by the associates specify the objects of their association. But, suppose the same associates desire a charter of

Bissell *v.* The Michigan Southern and Northern Indiana Railroad Companies.

incorporation for the more convenient prosecution of the same business, and obtain one. We shall find it to contain the like specification, which becomes the grant of power from the sovereign authority of the State. I am speaking of powers and privileges granted which are not, in their essential nature, corporate or public franchises, as distinguished from the private enterprises which any class of citizens may embark in; and, with the exception of municipal or governmental charters, the class of powers here referred to will be found to cover nearly the whole field of corporate rights. It is not difficult, then, to see the reason and policy which underlie such grants. The associates ask for a charter in order to carry on their business with greater advantages; and the same reason exists for a specification of the purposes of their organization as in the case of an association without a charter. The charter takes the place of the articles of agreement, and becomes the appropriate rule of action. No public interest or policy is involved, because the objects of the grant are not of a public nature. The powers and rights specified are identical with those which any private person or association of persons may exercise. If those who manage the concerns of a simple partnership deal with the funds in a manner or for purposes not specified, their acts are *ultra vires;* and if the directors of such a corporation, as I am here speaking of, do the same thing, their acts are also *ultra vires* in the same sense and no other. To apply the word "illegality" to such transactions, is to confound things of a totally different nature. It is only private interests which are affected by them; and there is no statute or rule of the common law by which they become public offences.

In every treatise upon the law of contracts—and there are many of them—we shall find an enumeration of such as are immoral or illegal; but amongst them cannot be found a specification of the promise or agreement of a corporation, founded on a lawful consideration, and to do that which in itself is lawful to be done, although not within the powers granted. It has always been supposed, and to that effect are all the authorities, that contracts are illegal either in respect to the

consideration or the promise. Where both of these are lawful and right, the maxim, " *ex turpi contractu non oritur actio,*" can have no application. The incapacity of the contracting party, whether it be a corporation, an infant, a *feme covert,* or a lunatic, has nothing to do with the legality of the contract, in that sense of the word which is now under discussion. So, in the treatises upon corporations, we shall find their rights and privileges to be very extensively considered, but nowhere an intimation that their dealings outside of their charters are deemed illegal for that cause. Even the proceeding against them by *quo warranto,* for the exercise of ungranted powers, will illustrate the subject. This is a civil, and not a criminal proceeding, and its object is purely and solely to try a civil right. (2 Kyd on Corporations, 439; Angel & Ames, 686; 1 Serg. & Rawle, 385; 3 Dallas, 490; 1 Blackf., 267.) Our statute on this subject makes it the duty of the Attorney-General to institute the proceeding, under leave of the court, when the case is one of public interest, but, in other cases, only at the instance of private parties claiming to be aggrieved by the abuse of power, and on security being given to indemnify the State. (2 R. S 583, §§ 39, 40.) In any case, whether the suit be founded on the alleged usurpation of a public or corporate office, or on the non-user or misuser of the franchises granted to a corporation, it is purely a civil right which is tried, and the judgment is not penal, but simply one of ouster from the right claimed. The legislature may, and sometimes does, expressly prohibit the doing of certain acts by corporations, having in view the promotion of some particular policy of the State, and may declare such acts to be public offences, to be punished by fine or imprisonment of the parties engaged in them. There are such laws in regard to incorporated as well as private banks, the object of which is to protect the currency of the State. But where there are no such penalties or prohibitions, and the dealings of a corporation have no relation to State policy, but are such as all mankind may freely engage in, the law has provided no punishment for such dealings, because it does not regard them as a violation of its principles and enactments in

any sense which is material to the present inquiry. I do not deny that there is, in a different sense, a legal wrong in the mis-application of the corporate capital and funds; and so there is in every breach of trust or violation of contract. But the true inquiry here is, whether it belongs to the class of public, as distinguished from private wrongs, so that the guilty party may set it up in avoidance of just obligations; and whether the courts must, in all circumstances, accept that defence without regard to the situation and rights of the other party. I cannot believe such to be the rule of reason or of law.

Let us now concede that the unauthorized contracts of a corporation are illegal in the sense contended for. It by no means follows that they are never to be enforced. An agreement declared by statute to be void cannot be enforced, because such is the legislative will. But when, without any such declaration, it is simply illegal, it is capable of enforcement where justice plainly requires it. Circumstances may and often do exist, which estop the offender from taking advantage of his own wrong. The contract may be entered into on the other side without any participation in the guilt, and without any knowledge even of the vice which contaminates it. An innocent person may part with value, or otherwise change his situation, upon the faith of the contract. A railroad corporation, for example, may purchase iron rails and give its obligation to pay for them with a design to sell them again on speculation, instead of using them for continuing its track. Such a transaction is clearly unauthorized, and is, therefore, said to be illegal. But if the corporation is deemed to make the contract—in other words, if, as I have above shown, it is a legal possibility for corporations to make contracts outside of their just powers, how can its illegality be set up against the other party who knows nothing of the unlawful purpose? So an incorporated bank may purchase land, having power to do so for a banking house, but actually intending to speculate in the transaction. This is also *ultra vires*, but can the want of authority be interposed in repudiation of a just obligation to pay for the same land, the vendor not being *in pari delicto?*

Such a doctrine is not only shocking to the reason and conscience of mankind, but it goes far beyond the law in regard to the illegal contracts of private individuals.

As I am not contending that the unauthorized dealings of a corporation are never to be questioned, the object of this discussion has been to ascertain the true ground on which they can be impeached where they are not attended by the vices which are fatal to private contracts also. I have shown, I trust, 1. That such dealings are possible in law, as they often take place in fact: in other words, that it is in the nature of these bodies to overleap the restraints imposed upon them. 2. That a transgression of this nature is a simple excess of power (using that word to express the rules of action prescribed in their charters, and by which they ought to regulate their conduct), but is not tainted with illegality so as to avoid the contract, or dealing, on that ground. This proposition, it seems hardly necessary to repeat, is applied only to transactions which involve or contemplate no violation of the code of public or criminal law, but, on the contrary, are innocent and lawful in themselves. 3. Even illegal contracts, in the proper sense, are not, universally and indiscriminately, to be adjudged void; and, especially, this is not so where the offender alleges his own wrong to avoid just responsibility, the other party being innocent of the offence.

If these negative conclusions cannot be denied, it follows that contracts and dealings, such as I have been speaking of, are to be condemned by the courts only on the ground that they are a breach of the duty which private corporations owe to the stockholders to whom the capital beneficially belongs. It is the undoubted right of stockholders to complain of any diversion of the corporate funds to purposes unauthorized in the charter. This, as a general principle, cannot be too strongly asserted; and by this principle, justly applied to particular instances, the question in such cases is to be resolved. The original subscribers contribute the capital invested, and they and those who succeed to their shares are always, in equity, the owners of that capital. But, legally, the ownership is vested in the corporate body, impressed with the trusts and duties prescribed in the

charter. In these relations we have the only true foundation of the plea of *ultra vires*. That term is of very modern invention, and I do not think it well chosen to express the only principle which it can be allowed to represent in cases of this nature. It is not to be understood as an absolute and peremptory defence in all cases of excess of power, without regard to other circumstances and considerations. It is not to be looked upon as a plea which denies the actual exertion of corporate power when a corporation enters into an engagement which, according to its charter, it ought not to make; but, because such was the nature of the contract, it presents the breach of trust or duty to the shareholders as an excuse for the non-performance. And I do not deny the validity of this excuse in many cases, I may say in all cases where it can be received without doing greater injustice to others. If the person dealing with a corporation knows of the wrong done or contemplated, and he cannot show the acquiescence of the shareholders, he ought not to complain if he cannot enforce the contract. Aside from the law of corporations, agreements which involve or propose a violation of trust will not be enforced by the courts where no greater equities demand it. Corporate bodies are more than mere agents. They are more than a partner who manages as the agent of his associates. Their powers are undelegated. They are the legal owners of the capital, or estate, and they have capacity to deal with it in contravention of duty or trust.

But the equitable rights of shareholders will enable them, in many circumstances, to claim the affirmative interposition of the courts to arrest an unauthorized course of dealing, or to prevent a threatened diversion of the capital to improper uses. Of this character are many of the cases usually cited, to prove that corporations cannot exceed their powers. (*Dodge* v. *Woolsey*, 18 How. U. S., 331; *Rolf* v. *Rogers*, 3 Paige, 154; Angel & Ames on Corp., 424, 4th ed., and cases cited.) So, too, it is plain, without citing authority, that a stockholder, who can show that he has sustained a pecuniary loss by such a use of the capital, may have his redress in damages against the indi-

viduals who commit the wrong, unless he has himself acquiesced. These are extensive, and, it would seem, ample remedies to prevent or redress the abuse of power; and it appears to me a much higher and better policy, that the private shareholders should be confined to these remedies, than to sacrifice the interests of the rest of community by conceding to these bodies absolute immunity whenever power is thus abused. But the principles which belong to this question need not present that naked alternative. In many cases no injustice will be done by receiving the plea of *ultra vires,* when defensively interposed by the corporation itself. But these are cases where a want of good faith can be imputed to the dealer, and where the defence, if allowed, will leave the parties substantially in the enjoyment of their previous rights. An artificial, not less than a natural person, having the title and possession of an estate which, in equity, belongs to others, and entering into engagements inconsistent with duty or trust, should have a *locus penitentiæ,* where it can be allowed without manifest wrong to others. It may be difficult to lay down a rule so general and so exact as to include every case; but the principles and analogies of the law will be sufficient for the solution of such questions as they arise. Justice, not only in this, but in very many other cases of constant occurrence, can be administered according to law, if I have succeeded in showing, negatively, that a comparison of the charter of a corporation with what it actually does is not always the test of liability.

It is said that there will be no restraint upon the acts and dealings of corporate bodies, if we uphold them when in excess of rightful authority. To this I answer, that the most ample restraints will be found in the principles here advocated; while, on the other hand, if we concede to corporations immunity in all cases when they do wrong, we invite and reward the very abuse. It is also said, in order to render this doctrine less offensive to the reason and conscience, that the innocent dealer may, upon the voidness of the contract and a disaffirmance of it, recover back the value or consideration with which he has parted. This position necessarily concedes that the corpora-

tion, as a legal person, made the unauthorized contract, and received the money, or value, under and according to it; thus overthrowing the main objection to its liability to respond directly upon the contract. It also concedes the innocence of the other contracting party; thus, according to all the analogies of the law, refuting the only other objection (illegality) on which the absolute invalidity of such dealings is claimed to rest: for, surely, after conceding that the corporation actually made the contract, it will not be contended that it can set up that it ought not to have made it, against an innocent person who has given up his money or property on the faith of the same contract. But I answer, further, that while in many cases the remedy of a suit in disaffirmance of the agreement, and to recover back the consideration, will be sufficient to prevent wrong, in many others it will be entirely worthless. All collateral securities must fall to the ground with the principal contract, and all its consequences and results. The present case will afford the best illustration. The defendants, in consideration of a trifling sum received from the plaintiff for fare, agreed to perform the service of carrying him in their cars, perhaps some two hundred miles. By the negligent performance of that agreement, they inflicted on him injuries for which a jury has said the proper compensation was $2,500. This being the measure of damages for the breach of the contract, the absurdity, not less than the injustice, of confining him to the remedy of disaffirmance because the agreement was *ultra vires*, must be quite apparent.

I have examined these questions with the more attention, because, aside from their bearing on the present controversy, they are of great practical importance. A vast amount of the business of the community has come to be carried on under corporate forms of organization. Besides innumerable special charters, we have general laws which impart corporate attributes to associations formed according to articles of agreement, for a great variety of purposes. When we consider these to be any less than partnerships, with the superadded privileges of succession, of a corporate seal, &c., we forget that corpora-

tions are no longer confined to the exercise of public or political franchises. These commercial, manufacturing, and trading bodies are brought into relation with almost every member of the community; and I think it greatly to be desired that, in laying down the rules of law which are to govern in such relations, we should avoid a system of destructive technicalities. Those rules should be founded in the principles of justice which are recognized in other and analogous dealings among men.

If we could find the law to be settled in the manner which must be and is contended for in order to exonerate the defendants in this case from responsibility, it would be our duty to follow it. But such is not the case. There are, certainly, judicial opinions, and some adjudged cases, which countenance the extreme doctrines on which the defence must rest. Among these cases, a leading one is that of *Hood* v. *The New York and New Haven Railroad Company* (22 Conn., 502). That case appears to go the length of holding that corporations cannot and never do perform acts in excess of their powers. No authority was cited for such a proposition, and it cannot, as I think I have shown, be maintained. Another extreme authority is, *Pearce* v. *The Madison and Indianapolis Railroad Company* (21 How. U. S., 442), where it appeared that a corporation, in furtherance of its general objects, although, strictly speaking, in excess of its powers, had entered into an engagement upon a consideration which it had received and appropriated. It was allowed to repudiate that engagement; but the principles of the question were not much discussed. A considerable number of other cases and *dicta*, of a character less marked, but tending in the same direction, might be referred to. But, on the other hand, there are well-considered authorities which sustain the principles advocated in this opinion. (*The Steam Navigation Co.* v. *Weed*, 17 Barb., 378; *The Silver Lake Bank* v. *North*, 4 Johns. Ch., 370; *The Chester Glass Co.* v. *Dewey*, 16 Mass., 94, 102; *The Bank of Genesee* v. *The Patchin Bank*, 3 Kern., 309, 314; *Bulkley* v. *Derby Fishing Co.*, 2 Conn., 252, 255; *Parker* v. *The Boston and Maine R. R.*, 3

Cush., 107, 108; *Alleghany City* v. *McClurkan et al.*, 14 Penn., 83; 29 Verm., 93.) In the case from 2d Connecticut, it was said: "A corporate body, by transgressing the limits of its charter, may doubtless incur a forfeiture of its privileges and powers; but who ever imagined that it could thus acquire immunity to the prejudice of third persons?" It will be found, indeed, that such a doctrine is of very modern origin. In the case from 14th Pennsylvania, COULTER, J., observed: "It is not universally true that a corporation cannot bind the corporators beyond what is expressly authorized in the charter. There is a power to contract, undoubtedly; and if a series of contracts have been made, openly and palpably within the knowledge of the corporators, the public have a right to presume that they are within the scope of the authority granted. A bank, which has been long in the habit of doing business of a particular description, would not be exonerated from liability because such business was not expressly authorized in its charter. The object of all law is to promote justice and honest dealing, when that can be done without violating principle. I cannot perceive that any principle is violated by holding a corporation liable for the acts of its accredited agents, even not expressly authorized, when these contracts for a series of times were entered into publicly and in such a manner as, by necessary and irresistible implication, to be within the knowledge of the corporators." "One rule of law," he adds, "is often met and counterchecked by another of equal force, so that, although the corporators are, in general, protected from unauthorized acts of their agents, yet, at the same time, a rule of equal force requires that they should not deceive the public or lead them to trust and confide in the unauthorized acts of their agents. If they receive the avails and value of those acts, it is implicit evidence that they consented to and authorized them." A more particular discussion of the authorities on either side, would not be profitable. The general question is one which ought to be considered on principle; and I have so viewed it, because I find no settled rule which stands in the way of such an examination.

But little more need be said in reference to the particular case now before us. If the defendants did not become liable for the breach of their undertaking to carry the plaintiff, or of their duty resulting from that undertaking, I can see no ground for holding them accountable as simple wrongdoers. If their contract was *ultra vires*, and that defence to an action upon it must be received as absolute and peremptory—if no principle of estoppel or rule of justice can be urged against that defence—then it is more clear that the simple wrong to the plaintiff's person was also *ultra vires.* It was with considerable difficulty that the liability of a corporation in any case for a pure tort was ever established; and they are never so liable except when engaged in the performance of some duty or undertaking in respect to which accountability arises. If the defendants' express undertaking was absolutely void, so that no duty could arise thereupon, the implied undertaking result-ing from the actual attempt to carry the plaintiff as a passen-ger is encountered by the same objection; and there is nothing left of the transaction except a pure and simple tort, committed by the defendants' servants while not engaged in any business which could bring responsibilities upon the defendants them-selves. I think it plain that this theory of liability will not sustain the plaintiff's case.

But I have no hesitation in affirming the judgment of the court below, upon the principles of contract and of duty resulting therefrom. That the entire course of business in which the defendants were engaged could not be justified by their charters, I am not prepared to deny. Each of them was chartered to build a railroad, the termini of which were speci-fied. They built the roads, and then consolidated their business. The common interest might thus be promoted; but it is difficult to affirm that the charter of either authorized its capital to be thus blended with that of the other. It is equally difficult to hold that they had any rightful authority to construct or lease another road in continuation of the line. But these things were actually done, and they were done openly and publicly. If these acts were an abuse of power, the shareholders had

ample opportunity to prevent or arrest the abuse. But no complaint from them has ever been heard, and their acquiescence must be presumed. If State sovereignties were wronged by the course of dealing pursued, no interference or complaint has come from that quarter. Conceding, then, that the defendants might change the attitude in which they stood toward the public, and return at any time to the sphere of legitimate duty, they could not revoke past contracts, the consideration of which they had received, and upon the performance of which they had entered. They were bound to pay their servants and laborers, and they were liable for the careful transportation of freight committed to their charge. They could not invite a traveler into their cars, and, after injuring him by their negligence, reject the responsibilities of their contract. A traveler from New York to the Mississippi can hardly be required to furnish himself with the charters of all the railroads on his route, or to study a treatise on the law of corporations. The present case, in short, plainly falls within the principles of corporate liability herein asserted, and the defendants must respond to that liability. The judgment should be affirmed.

SELDEN, J. It was not strenuously insisted upon the argument that the acts of these two railroad companies in entering into the arrangement found by the referee, and in running their cars upon joint account through the States of Ohio, Indiana and Illinois, were authorized by law; nor have I been able to find in the statutes of those States any sufficient warrant for these acts. I shall assume, therefore, that in undertaking to carry the plaintiff from Chicago, in the State of Illinois, to Toledo, in the State of Ohio, the defendants exceeded their corporate powers; and, as the allegation in the complaint, of carelessness and negligence on the part of the defendants, or their agents, is fully sustained by the finding of the referee, the defence must rest exclusively upon this want of power. The counsel on both sides have treated the action as founded upon contract, and in that aspect of the case the question arises whether want of authority on the part of a corporation, to

enter into any engagement, is a valid defence to such corporation when sued for its violation.

This question has not until lately attracted much attention. But the recent rapid multiplication of these artificial bodies, and the extensive powers and privileges conferred upon them, have made it a question of importance. It has, within a few years past, been repeatedly presented to the courts, both in this country and in England, and with one unvarying result. I cannot, myself, regard it, therefore, as in any just sense open to discussion. If questions, which have been over and over again considered, and over and over again decided, are to be treated as still unsettled, then are we without any stable foundation of law or justice. The evils attendant upon setting legal principles afloat upon a sea of uncertainty and doubt, and causing them to depend upon the fluctuations of individual opinion are too obvious to need enumeration. Confidence in courts is only to be retained by their exhibiting stability in their own decisions, and a becoming respect for those of other tribunals. It has been so often and so uniformly decided that corporations are not bound by contracts which are clearly *ultra vires,* that to hold the contrary now would take the legal profession by surprise, and introduce more or less confusion into this important branch of the law.

But, while I protest against considering this as an open question, and insist that it should be treated as settled by authority, I also maintain that the numerous decisions on the subject by both the English and the American courts, rest upon a solid foundation of reason and principle. Much of the apparent force of the arguments used to prove the contrary, is produced by substituting an entirely false basis for those decisions. If they really rested, as has been sometimes supposed, upon the ground that because corporations are artificial beings, having no natural powers, but only such as are conferred upon them by law, they cannot by possibility do any act beyond the limits prescribed by their charters; and hence that no such act, although done by their agents, in their name, and for their benefit, can be considered as a corporate act, but must in all cases be treated

as the personal act of such agent, it would, indeed, be easy to show their fallacy. This would be, as is justly said, to attribute to them a degree of perfection that belongs to no earthly existence, whether natural or artificial. To present this as the true foundation of the rule, which exempts corporations from liability for their unauthorized acts, is entirely to misapprehend the whole doctrine on the subject.

No court has ever held that the defence of *ultra vires* rested upon any such ground, as that the contract sought to be enforced could not be considered as an act of the corporation. The object of the distinction, so frequently drawn, between natural persons and corporations as mere artificial existences with no powers or faculties except such as are derived from their charters, is simply to show that the latter cannot legitimately and rightfully exercise any powers but those with which they are endowed by the law which creates them, and not that they may not wrongfully exceed the just limits of those powers. The case of *Barry* v. *The Merchants' Exchange Company* (1 Sandf. Ch. R., 280), will serve to illustrate the force and application of the distinction. The question in that case was, whether a corporation, created for the purpose of erecting a building to be used as a public exchange, in the city of New York, had power to borrow money to enable it to accomplish the object of the incorporation, no provision conferring this power being contained in the charter. The Vice-Chancellor, in deciding this question in the affirmative, said: "Every corporation, as such, has the capacity to take and grant property, and to contract obligations *in the same manner as an individual.*" This remark presents one theory in regard to the nature of corporations, which is, that unless specially restrained, they have the same power to bind themselves by contract as any natural person. The distinction referred to stands opposed to this theory, and is designed to show, that as corporations have no existence independent of their charters, they can, of course, have no powers except such as are specifically conferred.

When a corporation, sued for a breach of contract, sets up as a defence its own want of power to enter into the contract,

two questions are involved: first, whether the contract was, in truth, beyond the corporate powers; and, second, if so, whether this is available as a defence. It is only in reference to the first of these questions, and to prove that the contract was really *ultra vires*, that the argument has been resorted to, that a corporation has no natural powers. The excess of power being established, the question, whether this constitutes a valid defence, depends upon entirely different considerations.

The assumption, therefore, that the doctrine, which declares the unauthorized contract of a corporation to be void, rests in any degree upon the theory that a corporation can never be said to have done anything but what it had a legitimate right to do, is wholly unwarranted; and, hence, the irresistible logic with which it is shown that corporations must necessarily partake of the imperfection which attaches to all created things, is wholly without force in its application to the present case. Corporations, as well as natural persons, may, no doubt, err. They may exceed their powers and violate their charters, and may be held responsible for so doing. Were it otherwise, they could never be made liable for a tort; nor could they be proceeded against by *quo warranto*. The statute which authorizes the Attorney-General to file an information in the nature of a *quo warranto* against an offending corporation (2 R. S., 583, § 39), assumes that corporations may transgress the limits prescribed by their charters. Subdivision 5 of the section referred to provides that the proceeding may be instituted "whenever it (the corporation) shall exercise any franchise or privilege not conferred upon it by law."

The real ground upon which the defence of *ultra vires* rests, and the only one upon which it has ever, to any extent, been judicially based, is, that the contracts of corporations which are unauthorized by their charters are to be regarded as illegal, and, therefore, void. There are three classes of illegal contracts, viz.: those which are *mala in se*, *i. e.*, which embrace something which the law deems in and of itself criminal or immoral; 2d, those which violate the provisions of some statute, and are hence called *mala prohibita;* and, 3d, those which

contravene some principle of public policy. Corporations may make contracts falling within either of the two first of these classes, and such contracts are no doubt subject to the same rules as if made by individuals. Of course, where the only objection to the contract of a corporation is that it exceeds the corporate powers, it cannot be considered as *malum in se;* and although, in this State, where we have a statute (1 R. S., 600, § 3), expressly enacting that no corporation shall exercise any corporate powers except such as their charters confer, the contrary might, with much plausibility, be contended. I shall, nevertheless, concede, for the purposes of this case, that such contracts do not belong to the class styled *mala prohibita.*

But the contracts of corporations which are not authorized by their charters are illegal, because they are made in contravention of public policy. That contracts which do in reality contravene any principle of public policy are illegal and void, is not and cannot be denied. The doctrine is universal. There is no exception. Although the unauthorized contract may be neither *malum in se* nor *malum prohibitum*, but, on the contrary, may be for some benevolent or worthy object, as to build an almshouse or a college, or to purchase and distribute tracts or books of instruction, yet, if it is a violation of public policy for corporations to exercise powers which have never been granted to them, such contracts, notwithstanding their praiseworthy nature, are illegal and void. Those, therefore, who hold that corporations are liable upon their contracts, notwithstanding they were made without authority, are forced to contend that no principle of public policy is violated by such contracts. This is the ground which they do take, and which, it is obvious, they must necessarily take, in order to sustain their position. Here, then, we have an issue made up, which, if I am right, is decisive of the question under consideration.

What, then, is the argument, by which it is sought to be shown that there is no principle of public policy involved in this question of the liability of corporations for their unauthorized acts? It is said that a private corporation is simply a chartered partnership, possessing certain attributes conferred by

its charter for the purpose of enabling it the more conveniently to transact its business: that, even in unincorporated partnerships, the articles of copartnership always specify the objects of the association; and that, when such associations choose to become incorporated, those objects are, for the same reason, specified in the charter: that the charter simply takes the place in this respect of the articles of agreement, in the case of an unincorporated partnership: that, as the objects of such associations, although incorporated, are of a private nature, there is no question of public policy involved; and that no public interest requires that the transactions of the corporation should be kept within its chartered limits.

If we admit the soundness of this argument, and assume that the directors of a corporation are not under any public obligation to keep within their chartered powers, but are to be regarded simply as the agents of the corporators, so that any excess of power on their part amounts simply to a breach of trust towards their principals, it would not follow that the corporation is liable upon its unauthorized contracts. But I apprehend there are serious objections to this view of the nature of corporations, and of the effect of their charters. In the first place, if there is no public interest involved, how is it possible to justify the creation of private corporations at all? Such corporations are endowed with valuable franchises and privileges, which give them great advantages over mere private citizens, whether individual or associated. The grant of such privileges upon the principles for which some of my associates contend, would be a pure piece of legislative favoritism, which should be indignantly condemned. In this country, if in no other, it is held to be the duty of government to protect the people in the enjoyment of *equal* rights and privileges, and not to use its power for the special benefit of its favorites. Every privilege or advantage given to one man or set of men is necessarily at the expense of others; and it is against the fundamental principles of our government that this should be done, unless required by interests of a public nature. No doubt these principles are frequently violated, and corporate powers

and privileges are conferred which no public interest demands; but, nevertheless, such interest is the ostensible reason for the grant in every case.

Take, for instance, the very class of corporations in question here, viz., railroad corporations, which are mere private associations, organized by their members with a view to their personal profit and emolument; and yet their creation is considered so much a matter of public interest as to invoke the power of eminent domain, by which the property necessary for their purposes is forcibly taken from its owners as for a public use. The same is true of telegraph and plankroad incorporations. But, although the interest of the public in the creation of corporations of this class is made a little more obvious by the necessity which exists of taking from others property which is specific and tangible, for the purposes of the corporation, yet the same principle applies to all corporations; for in all some value, corporeal or incorporeal, is taken from a portion of the community and given to the corporators.

Will it be said that, although the public have an interest in the creation of corporations, it has none in the precise extent of the powers conferred, and that no public policy is concerned in their being strictly confined to the exercise of such powers? It is, obviously, impossible to support such a position. The franchises and privileges given to corporations belong to the public; and it would be just as reasonable, and just as logical, to contend that, under a patent for one hundred acres of land, the patentee might take possession of two hundred without infringing any public interest. Every additional power given to, or usurped by, a corporation, extends its advantages over persons unincorporated. If a bank is permitted to trade in merchandise, it comes in competition with others so employed. If a railroad company is allowed to build and sail ships, it comes in competition with those engaged in commerce; and so of every other branch of business.

The importance of limiting corporate bodies to the exercise of those powers, and the enjoyment of those privileges and franchises, which have been specifically conferred upon them,

must, I think, be obvious. They are rapidly multiplying. Their privileges give them decided advantages over mere private, unincorporated partnerships. They have large capitals and numerous agents, and are capable of entering into combinations with each other. They are not only formidable to individuals, but might even, under some circumstances, become formidable to the State. They are, or should be, created, as we 'have seen, for public reasons alone; and the legislature is presumed, in every instance, to have carefully considered the public interest, and to have granted just so much power, and so many peculiar privileges, as those interests are supposed to require. This reasoning is confirmed by the action of the legislature, in expressly prohibiting corporations from exercising any powers not granted to them. (1 R. S., 600, § 3, *supra.*) By making this principle of the common law the subject of an express and positive enactment, the legislature has shown that it considered this restriction upon corporations to be a matter of public interest and importance.

The fact that a mere excess of power on the part of a corporation, by the assumption of privileges not conferred, affords ground for a *quo warranto*, is in itself proof that the public has an interest in keeping such bodies within the limits of their charters. But it is said, that the proceeding by *quo warranto* is of a purely civil nature, designed solely to try a mere civil right, and that it in no manner assumes that any public right or interest has been infringed. Upon this position I take issue. In the first place, the assertion derives no support from, if it is not in direct conflict with, the legislative enactments on the subject. Not one of the provisions of the section by which the Attorney-General is authorized to institute proceedings in the nature of a *quo warranto*, contemplates injury to any private right as the ground of the proceeding. He is authorized to act in the following cases, viz.: Whenever a corporation shall "1st, Offend against any of the provisions of the act or acts creating, altering or renewing such corporation; or, 2d, Violate the provisions of any law, by which such corporation shall have forfeited its charter by misuser; or, 3d, Whenever

it shall have forfeited its privileges and franchises by non-user; or, 4th, Whenever it shall have done or omitted any acts which amount to a surrender of its corporate rights, privileges and franchises; or, 5th, Whenever it shall exercise any franchise or privilege not conferred upon it by law." (2 R. S., 583, § 39.)

Not one of these subdivisions contemplates a case of injury to the private interests of stockholders. They all, without exception, relate to violations, not of individual rights, but of public law. These provisions, therefore, strongly, and, as I think, conclusively repel the idea, that a *quo warranto* is a mere civil remedy, the object of which is to redress or prevent a private injury. The proceeding is not only public and *quasi* criminal in form, but is not in its nature adapted to the enforcement of any mere private right. The rights of stockholders in corporations are abundantly protected against every unauthorized assumption of power, or any breach of trust on the part of their managing officers. If the violation of duty or breach of trust is only threatened, a court of equity will prevent it by injunction, and if committed will afford the proper redress. There is neither occasion for, nor propriety in, a resort to the proceedings by *quo warranto* for any mere private purpose, and I hazard nothing in saying that such is not the nature of that proceeding. If this conclusion is right, it inevitably follows that the assumption of any unauthorized power by a corporation is a violation of public policy and public right, and therefore illegal.

This, then, is the true foundation of the defence we are considering. It is permitted upon the same principle and for the same reason that a private individual is permitted to plead his own illegal act, as a defence to a suit brought to enforce a contract which public policy forbids, viz.: to discourage and restrain such violations of law. There are, no doubt, cases in which a corporation would be estopped from setting up this defence, although its contract might have been really unauthorized. It would not be available in a suit brought by a *bona fide* indorsee of a negotiable promissory note, provided

the corporation was authorized to give notes for any purpose; and the reason is, that the corporation, by giving the note, has virtually represented that it was given for some legitimate purpose, and the indorsee could not be presumed to know the contrary. The note, however, if given by a corporation absolutely prohibited by its charter from giving notes at all, would be voidable not only in the hands of the original payee, but in those of any subsequent holder; because all persons dealing with a corporation are bound to take notice of the extent of its chartered powers.

The same principle is applicable to contracts not negotiable. Where the want of power is apparent upon comparing the act done with the terms of the charter, the party dealing with the corporation is presumed to have knowledge of the defect, and the defence of *ultra vires* is available against him. But such a defence would not be permitted to prevail against a party who cannot be presumed to have had any knowledge of the want of authority to make the contract. Hence, if the question of power depends not merely upon the law under which the corporation acts, but upon the existence of certain extrinsic facts, resting peculiarly within the knowledge of the corporate officers, then the corporation would, I apprehend, be estopped from denying that which, by assuming to make the contract, it had virtually affirmed.

A question analogous to this arises, where public officers who have done something in contravention of the statute under which they act, are afterwards sought to be estopped from setting up that their act was unauthorized. It was insisted by counsel in the case of *Regina* v. *White* (4 Ad. & El., N. S., 101), that for public reasons, officers so situated were not estopped; but Lord DENMAN said, "We have held that this is true only of a statute the contents of which are publicly known; such a statute is to have effect whatever dealings may take place; but when the persons acting, whether trustees for public purposes or not, have done any act which was not known to the parties with whom they were afterwards dealing, such an act cannot prevent the estoppel arising from that subsequent dealing."

This doctrine, which was also held in the case of *Doe, ex dem. Levy,* v. *Horne* (3 Ad. & El., N. S., 757), will be found, when carefully examined, to sustain the exception which I have suggested in the case of corporations. But, aside from these exceptional cases, it is, in my judgment, not only entirely clear upon principle, but abundantly settled by authority, that the contract of a corporation, if unauthorized by its charter, is an illegal contract, and that the corporation is not estopped from setting up this illegality in defence to an action brought upon it.

In referring to the cases which support these views, I will notice the English cases first. There are three classes of cases in England in which the question of *ultra vires* arises, viz.: 1st, Cases in which one or more of the shareholders seeks to restrain the officers of the corporation from engaging in transactions unauthorized by the charter. 2d, Actions brought by third persons against corporations to enforce their contracts, in which the defence relied upon is, that in making the contract the corporation exceeded its corporate powers. And 3d, Similar actions, in which the defence is that the directors had exceeded, not the powers conferred upon the entire corporation by law, but those conferred by the shareholders upon the directors or managing officers by deed.

These three classes of cases differ materially in their nature and principles, and if we would avoid confusion, must be kept entirely distinct in investigating the subject. Those of the third class have no bearing upon the question we are discussing. There are in England a class of corporations organized under general laws, which do not specify the manner in which the objects and purposes of the incorporation are to be effected, but leave this to be arranged by a "deed of settlement" between the corporators themselves. By this deed, the companies prescribe and limit the powers and functions of their various officers, so far as they are left uncontrolled by the statute, and the general laws of the kingdom. Now it is plain, that there is no analogy between an act which merely transcends the limits of this deed of settlement, and one which

violates the provisions of the organic act. The deed of settlement is the private act of the shareholders; and its provisions have respect solely to their private interests. It is a mere power of attorney, and bears no resemblance to a law enacted with a view to the interests of the public. There is evidently no question of public policy involved, when the question is, whether the officers have exceeded the authority conferred by this deed. The case of the *Royal British Bank* v. *Turquand* (5 El. and Bl., 248), is one of this class of cases. By comparing the language of Lord CAMPBELL in this case with that used by him upon another occasion, we shall obtain a clear view of the distinction here adverted to. In the case cited, the action was upon a bond signed by two of the directors, and the question was, not whether the giving of the bond exceeded the powers which the corporation itself had a right to assume, but whether it was authorized as between the shareholders and the directors by the deed of settlement. Lord CAMPBELL, in delivering his opinion, said: " A mere excess of authority by the directors we think would not amount to a defence." Of course by this was meant merely an excess of auhtority by the directors as the agents of the stockholders, and not an unauthorized assumption of power as between the corporation and the public.

In the *Mayor of Norwich* v. *The Norfolk Railroad Company* (30 Eng. Law and Eq., 120), the same learned judge fully recognizes the distinction I take, and shows that by the remark just quoted he by no means meant to say, that corporations were bound by contracts which are *ultra vires*, as between them and the public. He then says: " The mere circumstance, of a covenant by directors in the name of the company being *ultra vires as between them and the shareholders*, does not necessarily disentitle the covenantee to sue upon it. * * * * But suppose that the directors of a railway company should purchase a thousand gross of green spectacles as a speculation, and should put the seal of the company to a deed covenanting to pay for these goods, here would be a clear excess of authority on the part of the directors: * * * This would be

an *illegal* contract to misapply the funds of the company, and the illegality might be set up as a defence."

The phrase *ultra vires* is applied in the English cases both to acts which simply exceed the powers conferred by the deed of settlement upon the officers as the agents of the shareholders, and acts which transcend the powers conferred by law upon the entire corporation. This indiscriminate use of the phrase is calculated to mislead, unless the distinction referred to is observed. It is evident that the class of cases to which that of *Royal British Bank* v. *Turquand* belongs, have no bearing upon the question under consideration, and hence they will be no further noticed.

In all the cases belonging to the first class, the object of the action has been, to protect the private rights of the shareholders; upon the ground, that the action of the directors sought to be restrained would if permitted be a breach of trust. It would no doubt be a bar to any relief upon this ground, if it appeared that the parties seeking such relief, had themselves assented to what the directors were about to do. They clearly could not be entitled, for their own sake, to protection against acts which they had themselves authorized. But the courts, in cases of this kind, have uniformly, and no doubt properly, acted upon the presumption that the shareholders had not assented to a violation of the charter, and have interfered, if at all, for the purpose of protecting them from a breach of trust on the part of the directors.

Still it has been repeatedly said, even in cases of this class, that there was a question of public policy involved which would be sufficient of itself to induce the courts to interfere. The case of *Coleman* v. *The Eastern Counties Railway Company* (10 Beavan, 1), decided in 1846, was one of this class. It was an equity suit brought by a shareholder in behalf of himself and the other shareholders, against the corporation and its directors, to prevent the latter from entering into a certain agreement with the Harwich Steam Packet Company. The bill prayed for a declaration that it would be a breach of trust on the part of the directors to make the proposed con-

tract, and for an injunction. Relief was granted. Lord LANG-DALE, before whom the case was heard, speaking of the extensive powers of railway companies, said: "We are to look upon their powers as given to them in consideration of a benefit, which, notwithstanding all other sacrifices, is on the whole hoped to be attained *by the public.*" Again, he says: "In the absence of legal decisions, I look upon the acquiescence of shareholders, in these circumstances, in these transactions as affording no ground whatever for the presumption that they may be, in themselves, legal." Here, then, in one of the earliest cases on the subject, in the English courts, we have the very doctrine for which I contend, distinctly recognized and asserted, viz.: that the object of every grant of corporate powers is to obtain a *public* benefit; and that the powers granted are the consideration which the *public* pays for the benefit received or expected; and we also have the inevitable consequence stated, that every excess of power by the corporation is *illegal* although acquiesced in by every shareholder.

Three years afterward the case of *Cohen* v. *Wilkinson* (13 Jurist, 641) came before the same judge. The complainant was a shareholder in the Direct Portsmouth Railway Company, and the object of the suit was to restrain the directors from proceeding to construct a portion only of the road authorized by the charter, without any preparation or intention to construct the whole. The judge said: "If it were established that the companies of this sort had authority, without a view to the whole, or for the purpose of performing the whole, to complete such part only as they please, or are able, of that which has been called their *contract or bargain with the public,* I think the consequences would be very dangerous *to the public* and to the shareholders, and probably productive of very extensive deception and fraud." In a similar case which arose shortly afterwards, viz., *Solomons* v. *Laing* (12 Beavan, 339), Lord LANGDALE said: "Any application of, or dealing with, the capital, or any funds or money of the company, which may come under the control or management of the directors, or governing body of the company, in any manner *not distinctly*

*authorized* by the act of Parliament, is, in my opinion, an *illegal* application or dealing."

Thus we find Lord LANGDALE, on three different occasions, asserting, in controversies between the shareholders and the corporation, that all acts and dealings of the officers of such corporation which were unauthorized by their charters, were to be regarded, not simply as breaches of trust, but as illegal and therefore void. But Lord LANGDALE is not the only English judge who has held, in cases of this class, that the unauthorized contracts of corporations are illegal and void, as against public policy. In the case of *Beman* v. *Rufford* (6 Eng. Law and Eq. R., 106), which was an action brought by a shareholder in a railway company, to restrain the directors from carrying into effect a certain agreement made by them, Lord CRANWORTH, Vice-Chancellor, after stating his reasons for thinking the contract unauthorized, said: "And if that be the correct view of the law, I am clearly of opinion, on all the authorities and all principle, that it is the province of this court to prevent such an *illegal* contract from being carried into effect; because, on the principle that has been so often laid down, this court will not tolerate that parties having the enormous powers which those railway companies have obtained, shall lay out one farthing of the funds, out of the way in which it was *provided by the legislature* that they should be applied."

Now I understand those who differ with me on this subject to concede the principle of this case: that is, they admit, that for the directors to enter into a contract which their charter does not authorize, would be a violation of their duty to the shareholders, and that the latter may apply to a court of equity and obtain an injunction restraining the directors from carrying the contract into effect. It would be difficult to deny this. For if we take the same view of the nature of a corporation which they take, and consider the directors merely as the agents of the shareholders, and the charter as nothing more than their power of attorney from the corporators, the latter, as the principals, would have a right to repudiate and prevent the execution of a contract, made in their

behalf by their agents, without authority; inasmuch as every person dealing with such agents must, as is well settled, be presumed to know the extent of the powers which the charter confers.

The position then occupied by some of my associates is this: They admit that the shareholders in a corporation have a right to restrain its directors or managers, as their trustees or agents, from entering into any contract not authorized by the charter, or from carrying such contract into effect if made; and yet they hold that the directors are liable, not in their individual, but their corporate character, to the party with whom the contract is made for not carrying it into effect. It is difficult to see how these two propositions can stand together. The directors are the mere representatives of the corporators. The latter constitute the corporation. Hence, by the two propositions just stated, it is maintained, that the corporators have a legal right to enjoin their representatives against the performance of a contract, which they themselves are legally bound to perform; in other words, they are liable for damages, because their representatives have not performed a contract, which they had a right to restrain those representatives from performing. This can hardly be. It would seem to be a legal impossibility. One or the other of these propositions must, I think, be false. Either it must be denied that the shareholders can invoke the aid of a court of equity to prevent the performance of a contract entered into by the directors, which the charter does not authorize—a principle established by numerous authorities—or it must be admitted that they are not liable for the refusal or neglect of the directors to perform it. It might be otherwise if it could be shown either that persons dealing with corporations are not presumed to know the extent of the powers conferred by the charter, or that the corporators can be presumed to have authorized the directors to transcend those powers. But the contrary is the rule in respect to both.

It would seem to follow that if we look upon the unauthorized contracts of corporate officers as mere breaches of trust, and nothing more, the corporation is not bound by them. This

however is not the ground upon which I have been endeavoring to maintain that corporations are exempt from liability upon their contracts which are *ultra vires;* nor is it the ground upon which such defences have in general been sustained in suits brought by third persons against corporations upon such contracts. I shall therefore proceed further to show from the authorities that such contracts are illegal and void for public reasons, entirely irrespective of the fact that they constitute breaches of trust towards the shareholders.

I shall cite but one additional case belonging to the first of the above classes, viz.: *Winch* v. *The Birkenhead, Lancashire and Cheshire Junction Railroad Company* (13 Eng. Law and Eq., 506.) That was a suit in equity brought by a shareholder to restrain the corporation from entering into an agreement, which amounted to a lease of the defendants' road to the London and North Western Company. The Vice-Chancellor, Sir J. PARKER, in disposing of the case used the following language: "It seems to me that it is not a question of simple incapacity on the part of the London and North Western Railway Company to undertake the working of this line, but that it is *against the policy* of these acts of Parliament: and I think therefore that the agreement for making over this property to them, is an agreement *savouring of illegality*, which any shareholder in the Birkenhead Company has a right to come to the court to restrain."

The cases thus far noticed were all cases between the shareholders and the directors of the corporation, in which of course the question as to the liability of the corporation to third persons could not arise; and they have been referred to chiefly for the uniform *dicta* they contain, asserting the illegality of all unauthorized corporate contracts. I shall now refer to a class of cases in which the question of the liability of the corporation upon such contracts was directly involved.

The first case of this class, to which I will call attention, is that of *East Anglian Railway Company* v. *Eastern Counties Railway Company* (7 Eng. Law and Eq., 505). That was a suit upon a contract made by the directors, and the defence was, that

the contract was not warranted by the charter; and the court so held. JERVIS, Ch. J., speaking of the class of cases to which I have previously referred, says: "The cases in equity which have been cited, proceeded upon this view of the subject, and were decided, not because the particular act restrained by injunction was a *breach of trust,* but because it was not within the scope of the directors' authority, was not justified by the statute and was therefore *illegal.*" Again he says: "If the contract is illegal, as being contrary to the act of Parliament, it is unnecessary to consider the effect of dissenting share-holders." This is a most explicit and emphatic judicial affirmation of the precise doctrine for which I contend, by the Court of Common Pleas in England, in a case in which there was no dissent.

The same doctrine has been held in several later English cases. Upon an application in *The Great Northern Railway Company* v. *Eastern Counties Railway Company* (12 Eng. Law and Eq., 224), for an injunction to restrain the defendants from interfering, contrary to an agreement between the parties, to obstruct the plaintiffs in their use of a part of the defendants' road, which was opposed on the ground that the agreement was *ultra vires,* the Vice-Chancellor said: "If, therefore, this cause had rested wholly upon the construction of the agreement between the plaintiffs and the defendants, I should have thought it the duty of the court to interfere to some extent by injunction; but I think *there lies at the root of this case a question of public policy,* which precludes the interference of the court." These two cases were directly upon the point; and they show the opinion of the Court of Common Pleas and the Court of Chancery.

The next case to which I shall refer, viz.: *McGregor* v. *The Official Manager of the Deal and Dover Railway Company* (16 Eng. Law and Eq., 180), was in the Court of Exchequer Chamber. It was an action at law to recover damages for the breach of a contract; and the defence was, that the contract was *ultra vires.* The judgment of the court was delivered by Baron ALDERSON, who said: "The Solicitor-General argued

that this promise of the defendant was in truth a promise that the South Eastern Company should do an *illegal* thing, and that the promise was therefore void; and we are of that opinion. This is not like the promise of a party that an act *impossible to* be done shall be done by the defendant, or by some third person; but it is a promise that an act shall be done contrary to the *public law* of the country, of which both parties are bound to take notice. The act is therefore *illegal*, and the promise that it should be done is a void promise." The contract, concerning which this was said, was illegal in no other sense than that it was *ultra vires*.

In the subsequent case of *South Yorkshire Railway* v. *Great Northern Railway Company*, in the Court of Exchequer (9 Exch. R., 55), where the questions were, 1. Whether the contract upon which the suit was brought was authorized; and, 2. If not, whether that constituted a defence—the court gave judgment for the plaintiff, on the ground that the defendants, in entering into the contract, had not exceeded their corporate powers. But no doubt seems to have been entertained, that the contract, if *ultra vires*, would have been void. Barons MARTIN and PARKE expressly so held; and no opinion to the contrary was intimated by the other judges. It is true that Baron PARKE, at the close of his opinion, says: "I am happy to find that the law of this case coincides with the honesty of it, and does not sanction the breach by the defendants' company of the solemn contract into which they have fairly entered, and from which they are trying to escape." He had, however, previously laid down the rule as follows: "But where a corporation is created by an act of Parliament, for particular purposes, with special powers, then, indeed, another question arises. Their deed, though under their corporate seal, and that regularly affixed, does not bind them, if it appear, by the express provisions of the statute creating the corporation, or by necessary or reasonable inference from its enactments, that the deed was *ultra vires*."

Sir WILLIAM ERLE, one of the justices of the Queen's Bench, appears to be the only one of all the English judges who ever

entertained any serious doubt upon this question. In *The Mayor, &c., of Norwich* v. *The Norfolk Railway Company* (30 Eng. Law and Eq., 120), where the question arose, he combated the doctrine; contending that, in all those equity cases in which corporations had been restrained, at the instance of the shareholders, from entering into certain engagements, the court had proceeded solely upon the ground that the contracts, if made, would have amounted to a breach of trust; and insisted that the contracts of corporations were only void at law when expressly prohibited. But, in the same case, Lord CAMPBELL and Mr. Justice COLERIDGE expressed their entire concurrence in the previous decisions.

The question was finally carried to the House of Lords, in the case of *Eastern Counties Railway Company* v. *Hawks* (35 Eng. Law and Eq., 8); and although the contract in that case was held to be within the powers of the corporation, and, therefore, binding, it was, nevertheless, expressly and fully conceded that, if it had been *ultra vires*, it would have been illegal and void. Lord Chancellor CRANWORTH, after citing the cases of *The East Anglian Railway Company* v. *The Eastern Counties Railway Company*, and *McGregor* v. *The Official Manager of the Deal and Dover Railway Company* (*supra*), said: "I have referred to those cases, and there are others to the same effect, for the purpose of showing how firmly the law on this subject is established, and of guarding myself against being supposed to throw any doubt upon it. But I do not think the present case comes within the principle on which these decisions have rested." Lord CAMPBELL, in the same case, also fully assents to the doctrine; and yet this case is cited and relied upon to support the views of those of my associates who differ with me upon this question. But it will be found, upon examination, that even Lord ST. LEONARDS, upon whose remarks they particularly rely, himself concedes the rule. He said: "The opinions of some of the judges in the Norwich case (*Mayor of Norwich* v. *The Norfolk Railway Company, supra*), favor the disposition which I feel to restrain the doctrine of *ultra vires to clear cases* of excess of power, with the knowledge

of the other party, express or implied from the nature of the corporation and of the contract entered into." To this I agree. So far from denying the principle for which I contend, it concedes it. He afterwards says, speaking of two cases decided by the House of Lords at the same session: "They do not authorize directors to bind their companies by contracts foreign to the purposes for which they were established; but they do hold companies bound by contracts duly entered into by their directors for purposes which they have treated as within the objects of their acts, and which cannot *clearly* be shown not to fall within them; and they further hold companies to be bound by a continued course of dealing by their directors with third persons in relation to their shares, although that mode of dealing is contrary to the regulations of their *deed of management.*" In this extract the judge again recognizes the doctrine, but insists that it should be made clearly to appear that the contract is *ultra vires* before it is applied. His last remark evidently refers to the class of cases already noticed, in which the defence is, not that the directors, in making the contract, exceeded the statutory powers of the entire corporation, but only the powers conferred by the deed of settlement. Those cases, as we have seen, have no bearing upon the question under discussion.

This review of the cases in England leaves no doubt as to the law upon this subject there. The question has been before every judge and every court, has been presented in every possible form, and argued by men of the highest talent, and the result has been uniformly the same. If it is possible to settle this question by authority, this must settle it at least in that country.

I shall content myself with a brief reference to the American cases, beginning with those in this State. The question was directly presented to, and decided by, the Supreme Court in the case of *Safford* v. *Wyckoff* (1 Hill, 11). The action was against the defendant, as president of a bank organized under the general law of 1838, upon a bill of exchange or draft drawn by the bank, upon the North American Trust and Banking Company, in favor of one Dodge and indorsed to the plaintiff.

It was held in this case, 1st, that the bank had no authority to issue drafts on time; and, 2d, that this constituted a good defence to the action. This case was prior to the entire series of English cases to which I have referred, and yet our court, without any of the light thrown upon this subject by those cases, placed its decision upon grounds, which the courts at Westminster, after the most elaborate discussion and examination, have fully confirmed. The opinion of the court was delivered by Mr. Justice COWEN, who says: " True, there is no nullifying clause in the statute against negotiable notes and bills, in whatever way or form issued, nor any positive prohibition or negative against them. But both are most obviously implied, not only in the general frame and scope of the statute, but more emphatically in its policy." In this sentence the judge met the argument that a contract which is merely unauthorized but not prohibited is not illegal. Another argument is answered by the following remark : " We admit the defence is an ungracious one, both as to Dodge and the drawers; it is not, however, *for their sake*, but for that of the statute *and the public* that we feel constrained to give full scope to their defence. There would be more difficulty in sustaining it, as to the indorser, were it not to be regarded as an obvious attempt by all parties to violate a principle of public policy."

Here, then, *in limine*, we have the doctrine placed, in this State, upon grounds which subsequent repeated examinations have shown to be just. It is true that this case was reversed by the late Court of Errors (4 Hill, 442). But as this reversal proceeded upon the ground, that the bank had power to issue the draft, it in no manner impairs the authority of the decision of the Supreme Court upon the point we are considering. Indeed the Court of Errors, itself, confirmed the doctrine in the subsequent case of *McCullough* v. *Moss* (5 Denio, 567). Of the other cases in this State I will only notice those in this court, the most marked of which is the case of *Leavitt* v. *Palmer* (3 Comst., 19). This was an important case, and was elaborately argued. The suit was brought by a receiver of the company, and its object was to cause to be set aside and can-

celed, forty-eight promissory notes of £1,000 each, issued by the North American Trust and Banking Company, upon the ground that they had been issued contrary to the provisions of the act of May 14, 1840. The question, therefore, was directly involved, whether a corporation can avoid its own contract by showing that it was made in contravention of the provisions of a public statute; and the report of the case shows that this question was distinctly presented and argued by the counsel. It was held unanimously by the court, that the notes having been issued in violation of the act, were illegal and void, and could not be enforced against the company.

There is this distinction between that case and the present: There the contract which the company had entered into was expressly prohibited; here it is prohibited by implication merely. But the case to which I have referred shows that this does not change the rule. The decisions in those cases all rest upon the ground that the contracts, being within the implied prohibition of the statute, were void as made in contravention of the policy of the law.

No such distinction, however, exists between the case under consideration, and that of *Talmage* v. *Pell* (3 Seld., 328). That case involved the validity of three several contracts of the North American Trust and Banking Company, a corporation organized under the general banking law of this State, viz.: 1, a contract to purchase a large amount of State stocks of the State of Ohio; 2, certain certificates of deposit or promissory notes, issued by the company in payment for the stocks; and 3, an assignment of a certain bond and mortgage as security for the notes. Neither of these contracts were expressly prohibited by any law. The only objection to them was that they were not authorized by the act under which the company was incorporated; and this court held the contracts to be illegal and void upon that ground.

These cases show, that in this State, the late Supreme Court and Court of Errors, and this court, have all concurred in holding, in accordance with the numerous English cases to which I have referred, that the contracts of corporations which

are *ultra vires*, are void and cannot be enforced.   Similar deci-
sions have been made by the courts of other States and of the
United States:   *The Pennsylvania and Delaware Canal Com-
pany* v. *Dandridge* (8 Gill. & John., 248); *Hood* v. *The New
York and New Haven Railroad Company* (22 Conn., 502);
*Elmore* v. *The Naugatuck Railroad Company* (23 id., 457); *Mu-
tual Savings, &c.*, v. *The Meriden Agency Company* (24 id., 159);
*The Naugatuck Railroad Company* v. *The Waterbury Button
Company* (id., 468); *Bank of Michigan* v. *Niles* (1 Doug. Mich.
R., 401); *Orr* v. *Lacey* (2 id., 254); *Root* v. *Goddard* (3 McL.,
102 ); *Root* v. *Wallace* (4 id., 8); *Dodge* v. *Woolsey* (18 How. U.
S. R., 331); *Pearce* v. *Madison and Quincy Railroad Company*,
and *Peru and Quincy Railroad Company* (21 id., 441).   I shall
not consume time and space by referring to these cases particu-
larly.   If principles can ever be settled by authority, if the
slightest respect is due to the opinions of other tribunals, it
would seem that no court could resist the overwhelming weight
of the decisions which have been cited.

The strength of the opposing views consists in the alleged
injustice of permitting a corporation to avoid obligations by
pleading its own want of power to incur them.   But it should
be remembered, that this argument is just as applicable to the
case of an individual who sets up the illegality of his own con-
tract, and thus shields himself from responsibility upon it, as
to that of a corporation.   If it be said, that in the case of ille-
gal contracts between individuals, each party is a participator
in the guilt, and hence the law will not interpose to protect
either; this is equally true in respect to the unauthorized con-
tracts of corporations.   Their powers are prescribed by statute,
and every one who deals with them is presumed to know the
extent of these powers.   Where the circumstances are such
that this presumption cannot arise, as where the want of power
is not apparent upon the face of the statute, but depends upon
the existence of some extrinsic fact known to the corporation,
but not the party dealing with, it has been already conceded
that the corporation would be estopped from setting up that
its contract was *ultra vires.*

But the injustice which can ever accrue to individuals from permitting the defence in question, is trifling, under the law as now settled, compared with the importance to the public of keeping corporations within their chartered limits. It has been repeatedly held by this court, that where corporations, by means of contracts or engagements prohibited by law, *i. e.*, which are unauthorized by their charters, have obtained from other persons any money or other thing of value, while the contract itself is void and can never be enforced, the corporation may nevertheless be compelled, in a suit brought in disaffirmance of the contract and founded upon the equities of the case, to restore what it has obtained. This rule removes from corporations all temptation to engage in illegal transactions; and while it tends thus to promote the public policy of the State, it at the same time protects individuals from any gross injustice.

My conclusion, therefore, is, that the contract of the defendants to transport the plaintiffs from Chicago to Toledo was illegal and void, they having, as we have seen, no power under their charters to enter into the engagement for running their cars on joint account between those two places. It does not follow, however, that they are not liable to the plaintiff in this action. The complaint is founded upon the duty which rested upon the defendants, growing out of the relation in which they stood to the plaintiff, to take care that he should not be injured by their negligence. If this duty could only arise out of some contract between the parties, then the conclusion arrived at would be fatal to the recovery. The contract actually made by the defendants to transport the plaintiff can form no part of the plaintiff's case, and he must recover, if at all, irrespective of that contract.

It is said that if the contract was *ultra vires* and the corporation is protected from all responsibility for its violation on that ground, it must be equally free from responsibility for an injury inflicted while attempting to perform it. But this, I apprehend, by no means follows, though it is probably true so far as the duty to observe due care grew out of the contract. The

plaintiff's claim, however, rests not upon his contract, but upon the right which every man has to be protected from injury through the carelessness of others. It has the same legal foundation as that of one who has been injured by the negligent driving of some person upon the public highway, or who has been run over by a train of cars, when crossing the railroad track. The duty to observe care in these cases arises, not upon any contract, but from the obligation which rests upon all persons, whether natural or artificial, so to conduct as not through their negligence to inflict injury upon others.

It is unnecessary to cite authorities to show that corporations are liable for the culpable negligence of their servants or agents while engaged in the business of the corporation, in the same manner as individuals are liable for the negligence of themselves or their servants. It will scarcely be doubted that if the defendants' cars, through the carelessness of their employees, had run over the plaintiff, while passing upon a highway across the track of any portion of the road used by them, the corporation would have been liable. They could not set up that having no power to run their cars beyond the limits prescribed by their respective charters, all acts outside of those limits must be regarded as the acts of the individuals performing them, and not of the corporation. We have already seen that corporations may exceed their powers and may perform unauthorized acts, and incur responsibilities thereby. There is no doubt that all that was done under the arrangement between the defendants, found by the referee, unauthorized and contrary to law, is nevertheless to be treated as done by the corporations themselves. The business was carried on under the direction of their managing officers, with their property and for their benefit, and they cannot now be heard to deny that it was done by them. It follows that at least in respect to all persons with whom they had no conventional relations, their responsibilities would be precisely the same as if the business in which they were engaged was lawful.

To test the liability of the defendants, therefore, in this case, it is necessary to inquire what would be the responsibility of

railroad companies in general towards persons sitting in their cars, but whom they have made no contract to transport. This must depend upon the circumstances under which the individuals had entered the cars. If they were there as mere trespassers, without shadow of right, the company would not, perhaps, be responsible for any injury they might sustain, through the negligence of its servants. But if, on the other hand, the entry into and remaining in the cars, was with the assent, express or implied, of the company, and injury should result from the negligence of the latter or its agents, the company would, I think, be responsible. It was held by this court in the case of *Nolton* v. *The Western Railroad Corporation* (15 N. Y., 444), that when a railroad company voluntarily undertakes to carry a passenger upon their road, although without compensation, if such passenger is injured by the culpable negligence of the agents of the company, the latter is liable, in the absence of any express agreement exempting it. The principle of that case is applicable to this. Although here, if we lay aside the contract, there was no undertaking to transport the plaintiff, either with or without compensation; yet this can make no difference, as the liability in such cases arises, not from any contract express or implied, but from the universal obligation of all persons to avoid injury to others through their negligence.

Suppose, while standing upon your own premises, you accidentally, but through sheer carelessness, discharge a gun and wound a person walking upon the highway, you are clearly liable for the injury. If the person injured, instead of being upon the highway, were in your own house with your assent, would not your liability be the same? No one can doubt it. Suppose, then, instead of being in a house with the owner's assent, the individual is in the car of a railroad company with the consent of the company, would he not have the same right to immunity from injury through the negligence of the company or its agents? This is self-evident. The company might not be liable in such a case for the careless discharge of a gun by one of its servants, because using the gun would be no part

of the servant's duty to his employers. But if, through the carelessness of the engineer, the boiler of the engine should burst, and injury should ensue, the liability of the company would be clear. So, if the injury arose from a collision, running off the track, or any such cause.

It will be seen, therefore, that the question of responsibility for injuries sustained from negligence, when the person injured is within the domain or upon the premises of the party guilty of the negligence, turns upon the inquiry whether he is there lawfully or as a trespasser. It is true that when the negligence occurs in the course of the performance of some gratuitous service by the party guilty of the negligence, for the party injured, the former is only liable for gross negligence; but no question on this subject arises in the present case, as the proof in that respect will be presumed to have been such as to support the judgment, since nothing appears to the contrary.

Was the plaintiff, then, in the defendants' cars as a mere trespasser, or was he there lawfully, as between him and the defendants. To this question there can be but one answer. The defendants can never allege that the plaintiff was in their cars as a trespasser, when he was there by their express assent. The contract between him and the company, it is true, for reasons of policy could not be enforced. The defendants might at any time have repudiated it, and required the defendant to leave the cars; and if he refused might thereafter have treated him as a trespasser. But neither his entry into the cars, nor his remaining there until required to leave, could ever be regarded by the defendants as an infringement upon their legal rights.

It may be said that the plaintiff by consenting to travel in the defendants' cars became a participator in their unlawful conduct, and hence is not entitled to recover; but for this position there is not a shadow of authority. The law offended against by entering into the illegal contract in this case, is a law of restriction upon the defendants and not upon the plaintiff. The implied prohibitions which were violated rested solely upon them. There was no law prohibiting the plaintiff from

traveling in their cars.  I have already adverted to the rule that where the illegality of the contract consists in the violation of some law, the prohibitions of which are aimed at one of the parties only, the other party is to be treated as comparatively innocent, and may have relief against the more guilty party even in an action *ex contractu*.  If, then, he is entitled to enforce a mere equity against the other party *a fortiori* may he claim redress for injuries consequent upon their *tortious* acts. He is so far regarded as *particeps criminis*, that he forfeits the whole benefit of his contract.  He could not recover for any failure of the company to transport him in due time or to transport him at all, whatever damages he might thereby sustain; but he cannot be said, like an outlawed felon, to have *caput lupinum* and thus to be liable to be knocked on the head like a wolf or to have his limbs broken with impunity. (4 Bl. Com., 320.)  Upon these grounds I think the recovery was right, and that the judgment should be affirmed.

CLERKE, J., delivered an opinion for affirmance on the ground last stated by SELDEN, J.  DENIO, J., was for reversal; all the ·other judges were for affirmance, but without passing upon the questions discussed by COMSTOCK, Ch. J., and SELDEN, J.

Judgment affirmed.