(50 Misc. Rep. 198.)

PEOPLE ex rel. PERKINS v. MOSS et al.

(Supreme Court, Special Term, New York County. April 18, 1906.)

1. LARCENY—WRONGFUL APPROPRIATION OF MONEY—CONTROL AS OFFICER OR TRUSTEE.

Where a vice president and trustee of a corporation advanced money to a political campaign committee, and was afterward reimbursed by the corporation, he had "control" of the corporate funds so wrongfully appropriated within Pen. Code, § 528, declaring that a person who, having in his control as officer or trustee any property of another, appropriates it to his own use or the use of another than the true owner is guilty of larceny.

[Ed. Note.—For cases in point, see vol. 18, Cent. Dig. Embezzlement, § 23.]

2. SAME—MISUSE OF CORPORATE FUNDS—DONATION FOR POLITICAL PURPOSES.

A donation of the funds of a life insurance company to a political campaign committee is contrary to public policy and illegal and sufficient to justify the arrest of the officer making the donation for violation of Pen. Code § 528, declaring that a person who, having in his control as officer or trustee any property of another, appropriates it to his own use or the use of another than the true owner with intent to deprive or defraud the true owner of his property is guilty of larceny.

Habeas corpus by the people, on the relation of one Perkins, against one Reardon, a peace officer, and Joseph H. Moss, city magistrate. Writ dismissed, and the prisoner remanded to custody. Reversed on appeal.

See 99 N. Y. Supp. 138.

Louis L. Delafield (Wm. N. Cohen, of counsel), for Perkins.
Wm. Travers Jerome, Dist. Atty., for Reardon.

GREENBAUM, J. The demurrers, by the traverse to the returns to the writs of habeas corpus and certiorari, challenge the sufficiency of the depositions taken before the magistrate, who issued the warrant under which the relator was arrested. The crime charged is grand larceny, and unless the evidence before the magistrate justified a

finding that said crime was committed and that there was reasonable
ground to believe that the relator committed it, the prisoner must be
discharged. The depositions in effect show that on or about December
30, 1904, the relator, who then was a trustee and vice president of the
New York Life Insurance Company, a corporation organized under
the laws of this state, and chairman of its finance committee, received
a check from said corporation of upwards of $48,000 as ostensible re-
imbursement, with interest, for the actual amount theretofore advanced
by him in behalf of said company, at the request of its president to
Cornelius N. Bliss, as chairman of the Republican National Commit-
tee, for use in the presidential campaign of 1904. It also appears from
said depositions that the entries in the books of the life insurance com-
pany do not disclose the nature or purpose of the payment made to
said relator. In a letter of the relator to the district attorney, forming
a part of one of the depositions and voluntarily written in explana-
tion of the transaction, he declares that the president of the company,
"Mr. McCall, stated to me that demands were being made upon him
for other political contributions of the company, which it did not seem
to him that it would be for the interest of the company to make, and
he said that it would make it easier for him to refuse such demands
if the payment to the Republican National Committee was not, at that
time, made directly from the funds of the company." He further ex-
plains that he had nothing to do with the books of account of the com-
pany and was absolutely ignorant of its bookkeeping methods and of
the way in which the entries of the repayment to him were made. He
also states: "I derived no personal advantage of any kind from the
transaction and certainly I had no interest other than to serve the in-
terests of the company," and that it never occurred to him "that there
could be any question as to the propriety of such expenditures." It
further appears that before the repayment was made to the relator the
matter was referred to at a meeting of the finance committee, who
made no record of it and took no formal action thereon, and that every
member of the committee individually expressed acquiescence in the
procedure. Do the facts disclosed by these depositions tend to estab-
lish the commission of the crime of larceny? Do they tend to show
that there is reasonable ground to believe that the relator committed
the crime? Unless both these questions may be answered in the af-
firmative, it is clear that the arrest was unwarranted.

The statute of this state which defines the crime of larceny is found
in section 528 of the Penal Code, which reads as follows:

"Section 528. Larceny defined.—A person who, with the intent to deprive or
defraud the true owner of his property, or of the use or benefit thereof, or to
appropriate the same to the use of the taker, or of any other person, either (1)
takes from the possession of the true owner, or of any other person, or obtains
from such possession by color or aid of fraudulent or false representation or
pretense, or of any false token or writing, or secretes, withholds, or appropri-
ates to his own use, or that of any person other than the true owner, any
money, personal property, thing in action, evidence of debt or contract, or
article of value of any kind; or (2), having in his possession, custody, or con-
trol, as a bailee, servant, attorney, agent, clerk, trustee, or officer of any person,
association, or corporation or public officer, or as a person authorized by agree-
ment, or by competent authority, to hold or take such possession, custody or

control, any money, property, evidence of debt or contract, article of value of any nature or thing in action or possession, appropriates the same to his own use, or that of any other person other than the true owner or person entitled to the benefit thereof, steals such property and is guilty of larceny."

A study of this section must convince the student of criminal law that it is not probable that the relator can be charged with the crime of larceny as defined by subdivision 1 thereof. Prior to the adoption of the Penal Code in 1881 the crime of larceny was an offense as defined at common law and by the Revised Statutes then in force. The Penal Code extended the scope of the crime of larceny so as to embrace acts which were declared criminal by various provisions of the statutes, including such crimes as embezzlement and breach of trust. People, etc., v. Dumar, 106 N. Y. 502, 508, 509, 13 N. E. 325. It is reasonably clear that to hold, in this case, that the crime of larceny was committed, it must be found under subdivision 2. It must appear that the relator "with intent to deprive or defraud the true owner of his property, or of the use and benefit thereof, or to appropriate the same to the use of the taker, or of any other person * * * having in his possession, custody or control * * * as trustee or officer of * * * any corporation * * *" said property "appropriates the same to his own use or that of any other person other than the true owner or person entitled to the benefit thereof." In contemplation of law a person found guilty of the crime described "steals such property." The relator concededly at the times alleged was a trustee of the corporation mentioned. Did he, as such trustee, appropriate from the funds or moneys of such corporation upwards of $48,000 to his own use or to that of Cornelius N. Bliss, as chairman of the National Republican Committee, who was a person other than the true owner or person entitled to the benefit thereof, with the intent to deprive the corporation of its said property? It is seriously argued by the learned counsel for the relator that he had not the custody, possession, nor control of the money of the corporation and of necessity, therefore, there could be no appropriation by him of said moneys. It is claimed that his relation to the transaction was one of mere passivity; that he was an instrument performing the bidding or request of the president of the corporation, his superior officer, and that, however negligent he may be found to have been in that behalf, for which he might be civilly liable, he does not come within the meaning of section 528 of the Penal Code. It seems to me that these deductions are fallacious and inconclusive and based upon a strained and narrow reading of the statute. Aside from the provisions of section 29 of the Penal Code, which make an accessory before the fact a principal, it is incomprehensible to me how it can be sound legal doctrine to hold that a trustee and vice president of a corporation, and in this case a chairman of its finance committee, may deliberately receive and take from another officer of the corporation moneys belonging to it with full knowledge that the act constitutes an unlawful diversion of funds and not be deemed to have the "control" of said moneys. As trustee an affirmative, active and vigilant duty devolved upon him. It is well settled that a co-trustee cannot assume an attitude of passivity when he knows of improprieties

of his associates "without coming equally under the judgment of the law" for the consequences of such acts. Matter of Niles, 113 N. Y. 547, 558, 21 N. E. 687; Earle v. Earle, 93 N. Y., 104, 113. The relator was not a mere instrument or agent of the president. He was a co-trustee, with a voice in matters affecting the finances of the corporation, and no command nor request of the president involving a breach of trust, acquiesced and participated in by him, may be used as a shield from the consequences of the breach. Assuming, then, that the relator, within the contemplation of the statute, exercised a control of the funds alleged to have been misappropriated, was their appropriation to the use of the chairman of the National Campaign Committee, under the circumstances here disclosed, a crime within the meaning of the law? It will doubtless be conceded, as a correct statement of the law, that if a trustee deliberately appropriate to the use of another trust moneys under his control, with the knowledge that he had no right to so apply them, and that the consequence of his act is to deprive the trust estate of its property, that a criminal intent to so deprive the estate of property would be inferable from these facts. But suppose, in the case instanced, it appeared that the trustee was not conscious of any moral wrongdoing, but, on the contrary, believed that his act might indirectly result in a protection or advantage to the trust estate, may it then be said that the act of the trustee constituted larceny? The answer to the question just propounded requires a preliminary consideration of the law bearing upon intent in the crime of larceny. Section 528 expressly states that there must be an "intent to deprive or defraud the true owner of his property," etc. Intent is, therefore, an indispensable element and necessarily involved in determining whether the crime was committed. And it has been held that the intent meant by the statute must be a criminal intent. McCourt v. People, etc., 64 N. Y. 583. In People, etc. v. Moore, 37 Hun, 93, the court (Justice Haight writing) says:

"Felonious intent, where used in penal statutes, means criminal intent, and criminal intent is an intent to deprive or defraud the true owner of his property."

An inquiry into the intent would not be essential where the acts charged were expressly prohibited by law and were declared to be a crime. Thus, if the giving of money of the corporation to a political campaign fund were at the time expressly prohibited and made criminal by a statute which since the hearing in this proceeding has been enacted, then the offense being malum prohibitum would be complete when the act is intentionally done. And the accused in such a case could not be heard to say that he was ignorant of or that he honestly misconstrued the law (People, etc., v. Powell, 63 N. Y. 88, 92, citing Gardner v. People, 62 N. Y. 299), where it was held that the indictment for a crime malum prohibitum would be supported irrespective of motive or intent. In the Powell Case the defendants were commissioners of charities, convicted for conspiracy in purchasing certain articles without advertising for proposals, as expressly required by law. The criminal charge, it will be observed, did not rest upon the mere violation of the statute requiring the defendants to advertise,

although that circumstance was relied upon as an important one in fixing the crime of conspiracy. The court held:

"To make an agreement between two or more persons to do an act innocent in itself a criminal conspiracy it is not enough that it appears that the act which was the object of the agreement was prohibited. The confederation must be corrupt. 3 Greenleaf, Evidence, 75. The agreement must have been entered into with an evil purpose as distinguishable from a purpose simply to do the act prohibited in ignorance of the prohibition. This is implied in the meaning of the word conspiracy. * * * The actual criminal intention belongs to the definition of the offense and must be shown to justify a conviction for conspiracy. * * * It was open for the jury to find upon the evidence that no criminal intention existed, and if this had been found, to have acquitted the defendants. The argument that they were presumed to know the law and that they, therefore, intended to violate it might properly have been urged before the jury, but the presumption was not in this case conclusive and they could not be made conspirators by presumption and intendment in the absence of any intent to violate the law."

To paraphrase from this opinion "the actual criminal intention belongs to the definition of the offense of larceny and must be shown to justify a conviction." What proofs, then, are required to justify the finding of an intent to deprive another of his property within the meaning of the larceny statute? In People, etc., v. Herrick, 13 Wend. 87, 91, which was a criminal case involving false representations, the court held that "the intent is inferred from the fact and that if there could be a false representation with an innocent intent the defendant should have shown it." In Stokes v. People, etc., 53 N. Y. 179, 13 Am. Rep. 492, it is said that "the intention may be inferred from the act, but this in principle is an inference of fact to be drawn by the jury and not an implication of law to be applied by the court." If the act of the trustee in appropriating trust property to the use of another was illegal and a breach of trust, and if the act was willfully done, the criminal intent may be inferred from the act itself. The proof of intent in such case would, of course, be presumptive only, subject to be overcome by proof of facts and circumstances that may be considered by the jury called upon to pass on the question of guilt. Indeed, in all cases where intent is a necessary incident to the commission of a crime, the question of intent must be submitted to the jury, who alone may determine that fact. People, etc., v. Flack, 125 N. Y. 324, 26 N. E. 267, 11 L. R. A. 807. Is the application of corporate funds to political uses illegal? In Moss v. Cohen, 158 N. Y. 240, 53 N. E. 8, cited by the relator, it is said that a contract made without legislative saction by a corporation, "and hence in excess of its powers, but involving no moral turpitude and offending against no express statute, is not illegal in such a sense as to prevent the maintenance of an action upon it. Bath Gas Light Co. v. Claffy, 151 N. Y. 24, 45 N. E. 390, 36 L. R. A. 664." It is further there said:

"In discussing the questions of that case Andrews, C. J., states what has already been suggested, that the word 'illegal' has often been used to describe a contract which was simply unauthorized and calls attention to several cases where the inexact and misleading use of the word 'illegal' has been alluded to. He also says that public policy is promoted by the discouragement of fraud and the maintenance of the obligation of contracts, unless the parties are guilty of a wrong."

There can be no doubt that the principle enunciated in the foregoing excerpt is now recognized in this state. But where the parties to a contract ultra vires are guilty of a public wrong in entering into it the courts will not uphold it. The question of the effect of unauthorized corporate act is learnedly and elaborately discussed in Bissell v. Michigan S. R. R., 22 N. Y. 258, in two opinions, the one by Chief Justice Comstock and the other by Justice Selden. The latter-named jurist maintained, citing numerous English cases, that every contract of a corporation unauthorized by its charter is illegal and void for the reason "that the assumption of any unauthorized power by a corporation is a violation of public policy and public right." Page 289. Bearing upon this conclusion Judge Selden remarked (page 287, 288):

"Every additional power given to, or usurped by, a corporation extends its advantage over persons unincorporated. If a bank is permitted to trade in merchandise it comes into competition with others so employed. * * * The importance of limiting corporate bodies to the exercise of those powers and the enjoyment of those privileges and franchises, which have been specifically conferred upon them, must, I think, be obvious. They are rapidly multiplying. Their privileges give them decided advantages over mere private, unincorporated partnerships. They have large capitals and numerous agents and are capable of entering into combinations with each other. They are not only formidable to individuals, but might even, under some circumstances, become formidable to the state. They are, or should be, created, as we have seen, for public reasons alone, and the Legislature is presumed to have carefully considered the public interest and to have granted just so much power and so many peculiar privileges as those in-interests are supposed to require."

Judge Comstock differed from his distinguished associate in the conclusion that every unauthorized act of a corporation was illegal, arguing that when the unauthorized act affected mere private rights the act should not necessarily be declared illegal. But there was no difference between them in the characterization of the act, as illegal and void, where the act itself offended public policy. According to Judge Comstock "the illegality of the act is determined in its quality." Page 270. In other words, according to Judge Selden, every unauthorized act of a corporation offended public policy and was hence illegal. According to Judge Comstock only such an unauthorized act which by reason of its quality or character could be said to be contrary to public policy or which is wrong in itself or expressly prohibited by law is illegal. There has never been a dissent in any judicial utterance, so far as I know, from the proposition that if the unauthorized act of the corporation was wrongful per se, or malum prohibitum, or offensive to public policy, it was an illegal, and, therefore, a void act. The test of illegality or wrongdoing must be found in the quality of the act complained of. Each unauthorized act must thus be specifically scrutinized to determine whether it is an illegal one or not. The duties of a trustee of a corporation are confined to the management and control of the specific business to which it is restricted by the state. Any use of the property by such a corporation to a purpose not directly connected with or involved in the business of the corporation clearly would be an unauthorized act. Assuredly it is not the part of the business of a life insurance company to participate in political ques-

tions. And the appropriation of its funds towards a political party, striving for the ascendency of its principles in public affairs and of the elevation if its nominees to public offices, is an unauthorized act. The relator was a trustee of a life insurance company, whose business presumably was exclusively confined to the insurance of the lives of human beings. The law permitted the creation of such a corporation because it recognized the importance to the individual of making provision for himself and family in his old age and for his family after death. The business of such a corporation embraces the essential purposes of savings institutions, with insurance features superadded.

Unlike private business corporations, the investments of a life insurance company are limited by law. Indeed, the only justification for the course pursued which has been urged is that the opinion of the relator and other trustees of the company was that the success of the Republican Party in 1904 was essential to the maintenance of values of the securities held by the company. But the trustees are not responsible for fluctuations in the values of securities resulting from political or general economic conditions brought about by no manipulative acts of theirs. They are not the repositories of the political opinions or consciences of the policy holders. It is safe to say that many thousands of the policy holders of the company in question differed radically from the relator and his associates in the belief that the best interests of the country would be served by the success of the Republican Party. To justify the act of trustees of such a corporation in contributing funds to a political campaign it would be necessary to find that, by virtue of their position as trustees, they may, according to their political views, be they for a protective tariff, free trade, socialism, prohibition, free silver, greenbacks, or what not, take the money from the pockets of their policy holders and, in effect, force many of them to contribute to a political party which they may be actively opposing by personal effort and with private means. It is clear that such acts could be countenanced only by those who shared the political views of the trustees, upon the theory that the end justified the means. But as every unauthorized act of a corporation is not necessarily illegal, it is pertinent now to inquire into the quality of the act under review and determine if it is also an illegal one. Is it an act that offends public policy? If it does, it is a public wrong, and therefore illegal. I appreciate that public policy is not determined by the opinions of private individuals, however great the aggregation of such opinions. Public clamor does not determine public policy. Public policy is manifested by public acts, legislative and judicial, and not by private opinion, however eminent. License Tax Cases, 72 U. S. 462, 18 L. Ed. 497. Is the application of the moneys of a life insurance company towards political campaign purposes an inherent wrong? The right of suffrage is exclusively accorded natural persons, citizens of the United States.

A corporation is an artificial creation, existing by the will of the people, as expressed through its lawmaking bodies, with the right to exercise such powers only as are expressly conferred upon it. To permit an artificial creature of the state, unless it be a corporation expressly permitted by law to engage in political matters, by the unau-

thorized use of its corporate funds, to become an active force in a
political contest, would, in my opinion, be to sanction an infringement
upon the rights of the voters, who alone, either as individuals or
through political organizations, may elect, directly or indirectly, officials
in advocacy of the principles for which they contend.    To encourage the
unauthorized use of corporate funds to political purposes might result
in the creatures of the state becoming its masters.    The artificial being
with restricted powers may become a monster that may dominate its
creator.    Any unauthorized act of a corporation that affects public in-
terests with such serious and far-reaching consequences is a menace to
the state and against public policy.    Considered thus, it is plain that the
donation to a famine fund or for the relief of the distressed in a great
calamity, while clearly unauthorized, is not an act of that quality which
may be said to offend public policy.    It is an act of humanity, which,
though unauthorized, and for which the trustees may, perhaps, be
civilly liable, does not infringe upon any rights which may injuriously
affect the public.    The act of contributing to a political campaign fund
by an individual out of his own funds is undoubtedly a most com-
mendable and praiseworthy one, if induced by a conscientious purpose
of legitimately forwarding the political views that he believes to be for
the best interests of the country.    But such a contribution becomes
pernicious if the contributor applies the moneys of a life insurance
corporation of which he is a trustee to such a political campaign fund.
Besides, it is not like the case of a contract, which, though ultra vires,
was, nevertheless, ostensibly made with the view of some direct benefit
to the corporation, but it is a voluntary giving away of corporate funds
with doubtful, remote, and indirect advantages that may possibly ac-
crue therefrom to the corporation.    If I am correct in assuming that
a corporate gift for political purposes is wrongful, and therefore illegal,
then, in a case where a trustee of a corporation like that of a life insur-
ance company who knowingly, consciously, and deliberately appropri-
ates the money of the corporation to the use of a political campaign
committee, there would be present all the elements required to estab-
lish the commission of the crime of larceny, and reasonable grounds
for believing that the person charged committed it, unless we may say,
as matter of law, that one charged with the commission of a crime
may escape its consequences by admitting the facts that prima facie
would establish it, and pleading ignorance of their legal effect and an
absence of intent to do any wrong.    I apprehend that while a court
might, after hearing all the proofs, be in a position in a given case to
hold, as matter of law, that no legal evidence of intent was established,
yet upon the issuance of a warrant upon the facts set forth in the dep-
ositions the court would not be justified in holding, as matter of law,
that there was no evidence before the magistrate to sustain his action.

Aside from the point that the intent may be inferred from the act,
it may also be said that from the special facts appearing in this case
a criminal intent may be inferred.    It is shown that the moneys were
not voted nor directed to be paid by the board of trustees of the life
insurance company, but were taken from the company's treasury by
the individual acts of the president and the relator, passively acquiesced

in by members of the finance committee, and that no record nor minute is anywhere found showing the purpose for which the payment was made. It is stated that the indirect method of making the political contributions was adopted to avoid the importunities of other political bodies, and that it would have been imprudent at the time to have made this contribution public. Giving full consideration to these explanations, it may, nevertheless, be asked why no entry was made of the true transaction at or about the time the check was issued on December 30th, nearly two months after the election, when the occasion for concealment had passed. It is asserted that the relator knew nothing of the bookkeeping methods of the company nor of the entries in respect of this transaction. It may be that such an explanation would be satisfactory to a jury, but the court may not, as matter of law, hold that relator's statement of his ignorance of these facts is conclusive evidence of the actual facts.

"The rule that where unimpeached witnesses testify positively to a fact and are uncontradicted, their testimony must be credited, is subject to many qualifications, and among them is this, that the interest of the witness may affect his credibility." Elwood v. Western Union Ry., 45 N. Y. 553, 6 Am. Rep. 140; Wohlfahrt v. Beckert, 92 N. Y. 490, 44 Am. Rep. 406.

The question of the credibility of the testimony would in such a case be for the jury to determine. I do not desire, in the remotest degree, by what I have said, to have it construed that I am expressing an opinion of the intent of the relator, my meaning and purpose being solely to show that, from the facts submitted, it would be peculiarly the province of the jury upon a consideration of all the facts and circumstances to find the intent, and that upon this application the court cannot affirmatively find that there is no evidence of intent. Since writing the foregoing I am in receipt of a supplementary brief submitted by the learned counsel for the relator, calling my attention to the passage by the Legislature, on April 16th, of an act to amend the general corporation law relative to political contributions by corporations. It is argued that where the intention of an earlier statute is doubtful, a subsequent legislative construction is of weight with the court, and further, that a construction of section 528 of the Penal Code that campaign contributions by directors of corporations are felonious, and therefore prohibitive, would be to assume that the statute just passed is mere brutum fulmen. I am not impressed by the force of either of these arguments. We are not confronted with the construction of a statute which specifically relates to political contributions by corporations, apparently inconsistent with another statute treating of the same subject, but with the application of a general law defining larceny to a given state of facts. The statutory enactment of a few days ago makes a political contribution by a corporation or its officers participating therein a misdemeanor. It is malum prohibitum. It by means follows, however, that because of this new provision a trustee who may hereafter be shown to have appropriated moneys of a corporation for political purposes would not be amenable to the larceny statute. It may be that if a case at some future time arise for the crime of larceny under a state of facts analogous to those here appearing,

the accused might be permitted to testify that he was ignorant of the existence of the law prohibiting political contributions as bearing upon the absence of the criminal intent which it is necessary to prove in such a case, although, if he were merely charged with the commission of a misdemeanor under the new statute, it would be sufficient merely to show the intention to do the prohibited act, and a plea of ignorance of the law in that case would be inadmissible. People, etc., v. Powell, supra. But the possible effect of the present law upon future cases, it seems to me, to be unnecessary now to consider, since the crime here charged must stand or fall under the statutes in force when it is alleged to have been committed.

The writ must be dismissed and the prisoner remanded to custody.