## Lifter et al. v. Ruth Gordon Building and Loan Association

*Abraham L. Freedman,* of *Wolf, Block, Schorr & Solis-Cohen,* for plaintiffs. *Simon Pearl* and *Maurice E. Cohen,* for defendant.

KUN, J., July 3, 1933.—Plaintiffs were the holders of a first mortgage in the amount of $8,500 against premises situated at the southwest corner of Sixty-second and Spruce Streets, Philadelphia, and the defendant association was the holder of a second mortgage secured on the same property. The first mortgage held by plaintiffs became due on February 24, 1930, and, the owner of the property being unable to pay the principal sum of the first mortgage, the defendant, in order to protect its second and subordinate lien, paid to plaintiffs the sum of $2,000 on account, leaving a balance of $6,500 due.

Thereafter, the plaintiffs notified the defendant that they were about to institute foreclosure proceedings unless the balance of the mortgage was paid, and accordingly the association, on September 29, 1930, entered into an agreement of mortgage extension with the plaintiffs, whereby the reduced principal sum of $6,500 was extended for the term of 3 years from February 24, 1930, and the defendant guaranteed and assumed the payment of the principal, interest, and other charges as required in the bond and mortgage. The facts which influenced defendant in executing the agreement are expressly enunciated in the agreement itself, as follows:

"Whereas, foreclosure proceedings at this time will cause great hardship to the said association for the reason that it will be unable to protect its equity in the said premises if they are sold at sheriff's sale under the said foreclosure proceedings, the said party of the second part has requested the parties of the first

part to extend the said loan as hereinafter mentioned, which the said parties of the first part have consented to do upon the agreement of the said party of the second part to do that which is hereinafter specified."

Further consideration for the agreement of extension appears in paragraph 3 of the amended statement of claim, in that plaintiffs waive their right to foreclose and to enter into immediate possession of the property and collect the rents, issues, and profits thereof; and in this manner defendant, as the holder of the second mortgage, was permitted to and in fact did, immediately after the date of the execution of the agreement, enter into possession of the mortgaged premises and since that time has been collecting the rents, issues, and profits thereof from the tenants of the property.

Default having been made in the payment of taxes, judgment was entered upon the bond accompanying the mortgage and damages assessed in the amount of $6,933.33. For the recovery of this sum the present suit has been instituted against the association on its agreement of assumption and extension.

To this suit defendant filed an affidavit of defense raising questions of law, as follows:

1. The extension agreement is ultra vires (a) generally and (b) because it is a guaranty or suretyship;

2. The agreement constitutes an increase of indebtedness and the statutory requirements in such cases have not been fulfilled;

3. Lack of authority of officers;

4. Absence of consideration.

The statutory demurrer was overruled with leave to the defendant to file an affidavit of defence to the merits, which it did, raising substantially the same questions. Plaintiffs have taken a rule for judgment for want of sufficient affidavit of defence.

The doctrine of ultra vires in the law of corporations has given rise to endless disputes, and attempts at classification are frequently found in the opinions of judges, the writings of corporation textbooks, and in legal periodicals. It is, of course, obviously true that a corporation has all those powers expressly granted to it in its charter and in the applicable statutes. The difficult question, and the one which has given rise to so much confusion and difficulty, is as to the extent of the implied powers of a corporation. As pointed out in 6 Fletcher, Cyclopedia of Private Corporations (perm. ed.), 191-97, sec. 2486:

"It is a familiar doctrine that every express grant of power to a corporation carries with it all the powers that may be implied from or which are incidental or auxiliary to those expressly conferred, and the corporation may do whatever is necessary or reasonably appropriate to their exercise. . . . The courts are in fair agreement as to the general nature and extent of these implied or incidental powers of a corporation. They all indorse the proposition that a corporation has authority to do what will legitimately tend to effectuate the express purposes and objects; that it may ordinarily do all those things that are convenient, suitable or necessary to enable it to fully perform the undertaking designated in its charter, and which usually and customarily attend the business for which it was organized. . . . The foregoing rules as to the incidental or implied powers of corporations are settled beyond question. It is in their application that the difficulty arises. No uniform rule has been or can be laid down as to what is or is not incidental, nor any test to determine whether a particular act is 'reasonably necessary' to the exercise of the corporation's express powers. Each case must depend upon its particular facts and circumstances and upon the nature of the powers granted. . . . There is no question but that the tendency of the courts is to broaden the scope of implied powers. . . ."

It may be stated then that the implied powers of a corporation are not merely those which are *indispensable to the exercise of the corporate purpose but* include all those powers which are fairly and reasonably necessary.

In Malone v. Lancaster Gas Light, etc., Co., 182 Pa. 309 (1897), it was decided that a corporation organized for the purpose of "manufacturing and supplying illuminating and heating gas" might, as an *incident to its corporate* business, deal in such patented appliances and conveniences as would induce new customers to use gas or old ones to use more. This decision was followed very recently in Com. ex rel. v. Philadelphia Electric Co., 300 Pa. 577, where it was held that the *Philadelphia Electric Company,* chartered for the purpose of supplying heat, light and power by electricity, might, as an incident to its business, sell electric appliances such as electric refrigerators, by means of which power is delivered to and utilized by its customers. The Supreme Court quoted with approval from Malone v. Lancaster Gas Light, etc., Co., supra, to the further effect that:

"In considering such questions, much weight must be allowed to the judgment of the parties most interested, the officers and stockholders of the corporation itself, and while they will not be permitted, as against the Commonwealth or a dissenting stockholder, to go outside of their legitimate corporate business, yet where the act questioned is of a nature to be fairly considered incidental or auxiliary to such business, it will not be unlawful because not within the literal terms of the corporate grant."

It would serve no useful purpose to assemble out of the mass of American decisions the enormous number of cases in which specific facts as to particular corporations have been considered in the determination of whether the express or implied powers of a corporation have been exceeded. It may be pointed out, however, that one of the extreme groups of cases in which it has been decided that the powers of the corporation have been exceeded is that relating to contracts of suretyship or, more plainly, the pledging of the corporation's credit. As a general rule, it may be said that a corporation has no implied power to pledge its credit. We will consider this classification of ultra vires cases because it is the one in which the doctrine would be pushed the furthest to strike down the corporate act. Even in such cases the courts have not been unmindful of the fact that in some instances the pledging of the corporation's credit is a necessary incident of its corporate business and that this incidental power may be implied. The cases on this subject may be explained by the statement that it is a fundamental doctrine that a corporation has the right to do all acts needful or considered reasonably necessary for the preservation and protection of its assets. The law is not so blind to reality as to announce that a corporation is powerless to protect itself from the loss or destruction of its assets; and this principle which authorizes self-preservation must in consequence approve the pledging of a corporation's credit for such purpose. The cases on this question are numerous. A few will suffice for purpose of illustration:

In J. L. Mott Iron Works v. Kaiser Co. et al. (S. C.), 103 S. E. 783 (1920), a builder owed money to a bank and the construction contract on which he was working was assigned to the bank as security for the payment of the debt. The contractor was unable to obtain materials to perform the work and the bank guaranteed payment so that the material might be shipped and the work performed. It was held that the bank had not exceeded its powers and was therefore liable for the payment for materials.

In Norton Grocery Co. v. Peoples Nat. Bank of Abingdon, 151 Va. 195, 144 S. E. 501 (1928), a national bank made loans to contractors. The contractors were threatened with insolvency but it appeared that the loans might be saved

if the work on which the contractors were engaged was completed. A trustee was appointed to act for the bank and other creditors, and the bank along with others guaranteed the payment of materialmen so that the work might be completed. On a full review of State and Federal decisions, the court concluded (p. 211):

"A bank may not lend its credit to another, even though such a transaction turns out to have been of benefit to the bank . . . but there is no reason in principle why a bank may not pledge its credit for its sole benefit in an effort to save itself from loss imminent under some lawful contract, and the fact that it may redound incidentally to the benefit of another does not invalidate the transaction and this notwithstanding the fact that the transaction is termed one of guaranty. . . . There is no black magic in a name."

And at page 209 it is stated:

"It is highly important that the directors of a bank should be vested with the power for the protection of assets and the saving of debts."

In Hess, Assignee, v. W. & J. Sloane, 66 App. Div. 522, 73 N. Y. Supp. 313, affirmed 173 N. Y. 616 (1903), a manufacturing and trading corporation sold a large quantity of goods on credit to a hotel keeper. The running of the hotel was the only source of income which the debtor had. It was held that the company had implied power to pledge its credit to assist such debtor to borrow money to enable him to continue the business and thereby pay for the goods sold to him by plaintiff.

In Woods Lumber Co. v. Moore, Trustee, 183 Cal. 497, 191 Pac. 905 (1920), it was decided, after an analysis of numerous cases, that the plaintiff corporation, engaged in the business of supplying costumes for theatrical productions, had the implied power to guarantee a contract by a motion picture company for lumber necessary to produce a film for which the plaintiff had contracted to furnish the costumes.

In our view of the law it makes no difference in the decision whether the contract of the defendant is a primary obligation, as indicated in Lowry, Trustee, v. Hensal's Heirs et al, 281 Pa. 572, Hazleton National Bank v. Kintz, 24 Pa. Superior Ct. 456, and especially Willock's Estate, 58 Pa. Superior Ct. 159, 163-165 (Kephart, J.), or one of suretyship as contended by defendant and as foreshadowed in the last-mentioned case at page 165, and definitely stated by Mr. Justice Simpson in the recent decision of Fidelity Mutual Life Insurance Co. v. Power et al., 311 Pa. 302.

The precise question whether such an agreement by a building and loan association is ultra vires has not been litigated in our appellate courts. We had the question before us in Sheckter v. Brier Building and Loan Association, March Term, 1932, No. 4727 (not reported), and decided it against the contention of the defendant, but the case went no further. The validity of such an agreement was sustained by us in Real Estate-Land Title & Trust Co. v. Pivot B. & L. Ass'n, 16 D. & C. 680, in which, however, the question of ultra vires was not raised. The point was involved in Brannen v. Granite-Silberstein B. & L. Ass'n, 310 Pa. 278, but the question was not raised. The case went off on the question of whether such an assumption agreement had been made and not on the power of the association to make it. Although the alleged agreement of the association in that case was to pay taxes, interest and only a part of the prior mortgage principal, the question in essence would be the same. It was apparently assumed both in the court below and in the Supreme Court that such an agreement is not ultra vires, as it was in Eidam v. The A. R. C. S. Bldg. & Loan Ass'n, 108 Pa. Superior Ct. 392.

However, as the matter is now flatly before us, we must proceed to a direct consideration of the question.

In the General Corporation Law of April 29, 1874, P. L. 73, sec. 1, 15 PS §1, we find among their powers enumerated the following:

"Seventh. To enter into any obligation necessary to the transaction of its ordinary affairs."

In section 2 (2) of the same act as amended by the Act of June 10, 1893, P. L. 435, 15 PS §3, we find:

"The purposes for which the said corporations may be formed shall be as follows: . . .

Fifteenth. Building and loan associations."

There follow the general provisions of the Act of 1874 relating to corporations generally and then provisions relating to specific types of corporations until we reach section 37 relating to building and loan associations, which reads:

"Building and loan associations incorporated under the provisions of this act, shall have the powers, and from the date of the letters patent creating the same, when not otherwise provided in this act, be governed, managed and controlled as follows:

*Clause* 1. They shall have the power and franchise of loaning or advancing to the stockholders thereof the moneys accumulated from time to time, and the power and right to secure the re-payment of such moneys, and the performance of the other conditions upon which the loans are to be made, by bond and mortgage or other security, as well as the power and right to purchase or erect houses, and to sell, convey, lease or mortgage the same at pleasure to their stockholders or others for the benefit of their stockholders. . . ."

There follow a number of clauses relating to the capital stock, withdrawals, the number, titles and duties of officers, the making of loans, repayment of loans, charging of interest, premiums and fines, and the dissolution of such corporations. Then follows clause 8, which provides:

"Any loan or building association incorporated by or under this act, is hereby authorized and empowered to purchase at any sheriff's or other judicial sale, or at any other sale, public or private, any real estate, upon which such association may have or hold any mortgage, judgment, lien, or other incumbrance, or ground rent, or in which said association may have an interest, and the real estate so purchased, or any other that such association may hold or be entitled to at the passage of this act, to sell, convey, lease, or mortgage at pleasure, to any person or persons whatsoever . . ."

Clause 9 as amended by the Act of May 5, 1921, P. L. 380, 15 PS §1032, authorizes associations, in addition to their right to purchase, hold, sell, and convey such real estate as the purposes of the corporation require, to puchase, sell and convey land to stockholders or others, with or without ground rent, provided the quantity of land purchased shall not exceed 50 acres, and shall be disposed of within 10 years from the date of incorporation.

The question which must be answered here is: What powers are implied as reasonably necessary and incidental to the powers expressly granted by the above statutory provisions?

On this basis, the decisions cited by the defendant in which certain acts were held to be beyond the powers of building and loan associations may be classified and become understandable. Thus the cases as to lack of authority to purchase real estate were properly decided because the power to do so was expressly limited. The purchase and sale of bills and notes is contrary to the express powers of associations. The opinions of the Attorney General condemning new phases of building association business and new plans of investments contrary to the express purpose declared in the statutes are therefore correct.

The opinions as to investments in office buildings, etc., were correctly decided, for the statute specifically provides the funds must be used for the making of loans and therefore other investments are prohibited. The opinions prohibiting the embarking upon insurance business properly prevent associations from entering into an entirely different business, which is specifically provided for under the insurance laws of the Commonwealth. The discounting of negotiable paper would be an invasion of banking powers by building and loan associations.

The fundamental distinction referred to was recognized by the Supreme Court in the affirmance of the elaborate and learned opinion of Judge Endlich in Folk v. State Capital Savings and Loan Association, 214 Pa. 529, 531-532, where he said:

"Like all the other special provisions concerning particular corporations, those dealing with building associations, whether contained in section 37 as originally enacted or incorporated in or added to it by subsequent legislation, are of course to be read as part, and in connection with the general provisions, of the act of 1874. They were not intended and cannot be properly understood as denying or limiting any of the powers conferred upon corporations generally except in so far as the subject-matter of those powers has been specifically dealt with in such a way as to expressly negative or necessarily imply a curtailment of them—as, e. g., concerning the purchase of real estate, the borrowing of money, the measure of fines, and the like. Apart from directions of this sort, the specific provisions on the subject of building associations are rather of an enlarging, enabling character, conceding to them exceptional powers by no means common to corporations generally and giving rise to no implication of an intent to deprive building associations of rights incidental, in the absence of special provisions, to their status as corporations under the general provisions of the act of 1874, and consistent with the character and objects of building associations generally."

From this it follows that a building and loan association does have the power expressly granted by the General Corporation Law, sec. 1 (VII), "to enter into any obligation necessary to the transaction of its ordinary affairs," and would have that right as an implied power, if not expressly granted.

The meaning of the word "necessary" in this phrase was also considered by Judge Endlich in Folk v. State Capital Savings and Loan Association, supra. He there said (page 537) :

"When it comes to determining what is 'necessary' for the conduct of the business and transaction of the affairs for which a corporation has been chartered, it must of course be understood that what is meant is a due and profitable prosecution of its lawful purposes; that the 'necessity' contemplated is a relative one having reference to economy, convenience, efficiency and success; and that some latitude is to be allowed to the discretion of the corporation itself in deciding what, from time to time, is or is not in that sense necessary. . . . "

Deciding as the learned judge did that "necessary" includes whatever is "convenient" to the association in the prosecution of its lawful purpose, it was accordingly held that a building and loan association has the power to employ solicitors and agents and to issue full-paid stock.

It seems to us that the right of a building and loan association, which by statute is allowed to invest in second mortgages, to protect itself against loss through foreclosure of prior liens and the wiping out of its assets is not merely a power convenient to the association but in the strictest sense of the words essential and necessary. The right of self-preservation is not merely a convenient power but, more than that, is a necessary power. The statutes which we have referred to expressly authorize associations to purchase real estate on

foreclosure and thereupon to mortgage them. Had the plaintiffs foreclosed on their mortgage and the defendant association bought the property in, it would have been obliged to pay the plaintiffs off, and to raise the money it could have mortgaged the property to another under direct and specific statutory authority. What was done in this case was exactly the same thing but by a different method. Again, instead of entering into an agreement of extension, the parties could have agreed that the property be foreclosed, purchased by the association and a new mortgage created by it in favor of the plaintiff. Undoubtedly such a transaction would be within the express terms of the statute relating to the purchase of real estate at foreclosure and its subsequent mortgage, and accordingly could not give rise to even the slightest suspicion of ultra vires. What was done in the present case was essentially the same thing in a different form. Since the transaction amounts to the same thing it cannot be stricken down. The doctrine of ultra vires is not a favorite of the law and the burden of showing ultra vires is on him who asserts it: Ellerman v. The Chicago Junction Rwys. and Union Stockyards Co. et al. 49 N. J. Eq. 217, 23 Atl. 287 (1891), wherein it was pointed out that a mere difference in the mechanics of the transaction will not render the act ultra vires. The court held:

"A corporation having power to take and dispose of the securities of another corporation may guarantee their payment if it disposes of them to another party in payment of its own debt; if it buys property subject to a mortgage securing bonds, it may guarantee the payment thereof if said guarantee is taken as payment *pro tanto* of its debt; the two transactions are the same in result, and mere routine of action cannot affect validity." At page 248 the court said: "The form of the contract is nothing. The whole question turns on the consideration."

A case strongly relied upon by the defendant is The National Home Building and Loan Ass'n v. The Home Savings Bank et al., 181 Ill. 35 (1899). We find, however, that not only is that case no authority for defendant's position, but that on the contrary it impliedly approves the right of the plaintiffs to recover in the present case.

The defendant concludes that because there was an assumption of a mortgage there by the association, and because it was held that its agreement to purchase was ultra vires, the case presents a precedent directly in point by the highest court of a sister State. An analysis of the case shows, however, that the lot which the association had assumed to buy and pay the mortgage on, and to which the point had reference, was one in which the association had no interest as mortgagee to protect, though it did have such an interest in an adjoining lot, which it bought at the same time. The court said (p. 43):

"The law has given such a corporation power to purchase such real estate as it has a mortgage on for its necessary protection in making collections, but that does not authorize it, by including such real estate, to buy another lot or a subdivision or part of a town, and enter into the business of trading in real estate."

The court decided that the association, which was given the statutory right (as in our statute in Pennsylvania) to purchase real estate on which it held a mortgage, could not be construed as authorized to purchase other real estate adjacent thereto on which it held no mortgage or encumbrance. The basis of the decision, therefore, was the power to purchase real estate. It so happened as a collateral fact that in this case the property on which the association had no mortgage or encumbrance, and which it therefore had no power to purchase, did have a mortgage or trust deed in favor of a third party, and a part of the consideration for the purchase and sale was the assumption by the association of this encumbrance. But the encumbrance was stricken

down as to the association, not because the assumption of it was illegal for that was not even involved, but because the deed itself, which was the basis of it, was inoperative and the purchase therefore void. The case shows that the association did have the power to purchase lot No. 6 (on which it had a mortgage), and the opinion clearly indicates that it could have assumed any prior encumbrances as to that lot, which, under the statute, it had the right to purchase.

We shall now refer to the main case cited by the defendant as directly in point and claimed to sustain its view. It is the English case of Small et al. v. Smith et al., 10 L. R. (A. C.) 119 (1884). While otherwise described, the transaction was in effect what we have in the instant case. In consideration of an extension of time for the payment of a prior mortgage, which had fallen due, the association, to protect its own mortgage on the property, agreed to pay it.

The building society became embarrassed and went into voluntary liquidation. The liquidators repudiated all liability under the extension agreement, or "bond of corroboration" as there described, and instituted an action to have it set aside on the ground that it was ultra vires.

The Scottish courts decided in favor of the of the society, and Small appealed to the House of Lords. The Lord Advocate (Balfour, Q. C.) argued for the appellant that the granting of the "bond of corroboration" was a valid transaction, as follows (p. 124):

"If the prior mortgagees had sold in the then state of the market there might have been a total loss of the £1,000 advanced by the society. And the delay of the sale was a good consideration for the bond. It was an act done every day for a postponed heritable mortgagee to either pay off a previous mortgage, or if not in funds to get the mortgagee to postpone the sale. No doubt the granting of a bond of corroboration was not one of the objects for which the society was constituted, but the rules empowered the directors to lend on postponed heritable securities. And they had also the power to borrow and pay off prior incumbrances. If the society had been in funds there was no doubt they could have paid off the appellants' claim: but instead—having, perhaps, a large amount of depreciated heritable property thrown on their hands—they granted the bond of corroboration. They submitted that if a society has entered into a transaction which is within the scope of its business, any act which is reasonable and proper to protect and make available its interests under that transaction, will be supported: Selwyn, L. J., in *In re Asiatic Bank, Royal Bank of India's Case* (1). [Law Rep. 4 Ch. App. Cas. at p. 260.] Here the granting of the bond of corroboration was a prudent thing to do. It was incidental to the society's business, and necessary to save their security from becoming a total loss."

It was argued for the respondents (appellees) that in fact the society under its rules had no power to lend money on anything but a first mortgage. The court finally stated at the argument that there was no doubt that under the rules of the society the right to lend money on second and third mortgages existed.

The facts show also that when the loan was granted the property was worth the total amount of the encumbrances, "but at the date of this action it had admittedly much depreciated in value. In October, 1878, the City of Glasgow Bank stopped payment and a great depreciation of building property followed." (p. 121).

We have examined the opinions of the lords with care but have not been convinced of the validity of their conclusion. We believe that an unprejudiced

observation must necessarily lead to the conclusion that the argument by Mr. Balfour in favor of the right exercised by the society remains unanswered. Whether the case would have been decided otherwise if there had not been the real estate depression mentioned in the opinion or likewise, if there had been evidence to show that the matter was prudently handled, or whether the consideration was sufficiently shown, it is difficult to say. It is enough, however, to point out that having been decided by a court of foreign jurisdiction, prejudiced as apparently it was against the granting of second mortgages and undoubtedly influenced by the insolvency of the association, it is not such a decision as by the strength of its logic and the irresistible force of its reasoning compels obedience. We regret our views are at variance with those of the learned lords.

We find, moreover, that the decision has been strongly shaken by a subsequent English decision. We refer to Sheffield and South Yorkshire Permanent Bldg. Society v. Aizlewood, L. R. 44 Ch. D. 412 (1889), in which it was expressly held that a building and loan association might, in order to protect its second mortgage investment, not merely guarantee the prior encumbrance' but even borrow money and pay it off, and that as a consequence of the right to invest on a second mortgage there must exist the right to protect the security against the prior mortgage; and beyond all this, that in order to protect its investment, it had the right to exploit the property mortgaged even to the extent of engaging in the mining business.

We also hold that where a corporation receives the benefit of the performance of a contract it cannot subsequently raise the defense of ultra vires. The law will not permit one who has reaped the benefits of an agreement subsequently to dispute its capacity to have done so.

The defendant has cited the language of Mr. Justice Gray in Central Transportation Co. v. Pullman's Palace Car Co., 139 U. S. 24, 59, to the effect that unauthorized acts of corporations cannot be ratified by performance of the other party. Aside from begging the very question as to whether or not the agreement in the instant case is unauthorized, the difficulty with this citation is that it is the leading case in that group of decisions following what is known as the Federal rule. It has no authority and has been rejected in this and in almost every State of the Union. As was said by Comstock, Ch. J., in Bissel v. The Michigan Southern and Northern Indiana Railroad Companies, 22 N. Y. 258, 264, 266:

"To say that a corporation has no right to do unauthorized acts, is only to put forth a very plain truism; but to say that such bodies have no power or capacity to err, is to impute to them an excellence which does not belong to any created existences with which we are acquainted. The distinction between power and right is no more to be lost sight of in respect to artificial than in respect to natural persons. . . .

". . . . When we speak of the powers of a corporation, the term only expresses the privileges and franchises which are bestowed in the charter; and when we say it cannot exercise other powers, the just meaning of the language is, that as the attempt to do so is without authority of law, the performance of unauthorized acts is a usurpation which may be a wrong to the State, or, perhaps, to the shareholders. But the usurpation is possible. In the same sense, natural persons are under restraints of law, but they may transgress the law, and when they do they are responsible for their acts."

The first view may be said to prevail in the Federal courts and a minority of the State courts, while the second view probably obtains in the courts of all but eight of the States. The first view is based upon the conception of limited corpo-

rate capacity; the conception that a corporation cannot do what it has not been given authority to do. This doctrine of limited capacity, like the doctrine of constructive notice, is the result of a judicial interpretation of legislative intention. At common law, a corporation had the capacity of natural persons, i. e., the capacity to do an unauthorized or even an illegal act.

The language of Mr. Justice Fell in Presbyterian Board v. Gilbee, 212 Pa. 310, 314, that "A corporation may not avail itself even of ultra vires as a defense where a contract has been entered into and executed in good faith by the other party and the corporation has received the benefit of the performance", finds approval in the following, among many other, decisions: Doylestown & Danborough Turnpike Road Co. v. Philadelphia & Easton Electric Railway Co. (No. 1), 49 Pa. Superior Ct. 381; Suburban Rapid Transit St. Rwy. Co. v. Monongahela Natural Gas Co., 230 Pa. 109; Ketchum et al. v. Conneaut Lake Co., 309 Pa. 224; Klema, Jr., et al. v. Pa. Slovak Roman and Greek Catholic Union, 108 Pa. Superior Ct. 127.

In Lemmon v. The East Palestine Rubber Co., 260 Pa. 28, plaintiff purchased from defendant 200 shares of its capital stock at $25 per share with a provision that defendant would furnish plaintiff a buyer of the stock within 6 months if desired at a price to net plaintiff a profit of $2.50 per share. The purchase price was paid by plaintiff to defendant. At the end of the 6-months' period, plaintiff made demand for a purchaser, and defendant failed to furnish one. Thereupon plaintiff sued for damages on the agreement. A verdict was rendered in favor of plaintiff for the price which he paid for the stock plus the net profit guaranteed. Judgment on the verdict was affirmed and it was decided, first, that the contract was not ultra vires, and second, that defendant was estopped from pleading ultra vires because plaintiff had performed and defendant had reaped the benefit of the performance. To allow a defense to be raised under such circumstances, said the court, "would be repugnant to justice." To the same effect see the recent case of Moss v. Stalwart Building and Loan Association, 108 Pa. Superior Ct. 231.

As was said in Mutual Trust Co. v. Stern, 235 Pa. 202, where it was held that a borrower on a note had no power to question the authority of a trust company to do a banking business after he had received the proceeds of the loan: "Having the proceeds of the note in his pocket, neither the law nor common honesty will permit the defendant to avail himself of the plea of ultra vires."

In Criswell's Appeal, 100 Pa. 488, a Pennsylvania building association, without authority from its charter or its bylaws, received "deposits" from persons who were not stockholders. It was decided that nevertheless such "depositors" were entitled to share on dissolution as creditors pari passu with those who were "depositors" in accordance with the charter and bylaws. Mr. Justice Sterrett, after quoting the bylaws, said (p. 494):

"These provisions evidently contemplated that stock-holders, and they alone, should be entitled to make interest-bearing deposits; but in fact the Association received deposits from strangers as well as from its own members. The money thus received passed into the treasury of the Association, and was used in its business. Members of the Association who enjoyed the benefit of these deposits cannot be permitted to say that those from whom the money was received are not creditors of the Association. To permit them to do so would be grossly inequitable and unjust."

In Mechanics' Bldg. & Saving Ass'n No. 2's Assigned Estate, 202 Pa. 589, 592-593, on distribution of the assigned estate of an insolvent building and loan association, it appeared the principal asset of the association was a piece of real estate which the officers had no authority to purchase. The transaction,

furthermore, was tainted because the officers of the vendor were practically the same as those of the vendee association.

Judge Endlich, whose opinion was affirmed on appeal, said:

"Let it be granted that the assignor association, because of the objections above indicated, might have disowned the purchase and avoided any indebtedness arising out of it, while the previous situation of the parties might still be restored, it must be self-evident that a failure to do so, for a number of years, with knowledge or the means of acquiring knowledge of the true state of affairs, followed by an assignment of the property for benefit of creditors and its sale by the society's assignee, has determined any such right: See Manhattan Hardware Co. v. Phalen, 128 Pa. 110, 118. The parties can no longer be replaced in the situation they occupied before. The property has been treated by the society as its own. It has been sold and the proceeds of its sale have been received by the society's agent. It follows that the price of it must be an enforceable demand against the society, for no one can have both land and price: Jacoby v. McMahon, 174 Pa. 133, 136. The price of the land in this case is represented by the notes in dispute, which, as found by the learned auditor, are therefore to be regarded as valid demands against the assignor on the ground of its ratification of the transaction out of which they grew."

The rule is sometimes stated in the form that "The doctrine of *ultra vires*, whether invoked for or against a corporation, is not favored in the law. It should never be applied where it will defeat the ends of justice, if such a result can be avoided": San Antonio v. Mehaffy, 96 U. S. 312.

The case of Bedell v. Oliver H. Bair Co., Inc., 104 Pa. Superior Ct. 146, is not at variance with our views. An extract from the opinion of the court is quoted as lending color to the defendant's view. However, that extract was not written by Judge Cunningham of the Superior Court but was merely a quotation from the opinion of the court below, which in turn was an extract from a footnote to Keener on Quasi-Contracts. Keener obviously was discussing the United States rule, as in fact appears expressly from the reference to the Pullman Car Company case. Under the United States rule, the contract being void, the same rule, in consideration of elementary principles of justice, declares that the plaintiff who cannot recover upon the contract itself will be allowed to recover the payments actually made to the defendant, on the theory of quasi contract.

The Bedell case quoted the United States rule for illustrative purposes. In that case a woman had made payments for 28 years to an undertaking company on what the court decided was a policy of insurance. At the end of the 28 years, the lower court having in another case decided that such contracts amounted to contracts of insurance, she instituted suit for the recovery of the moneys paid. Recovery was allowed, but an examination of the record, paper books and opinions of the court below discloses that there was no implied adoption by our appellate court of the United States rule. On the contrary, the basis for the decision was The Insurance Company Law of May 17, 1921, P. L. 682, art. I, sec. 107, 40 PS §367, which prohibits the doing of insurance business in this Commonwealth except as expressly provided, and further provides that premiums paid to any agent for so-called insurance may be recovered by an action at law.

A further provision is the Insurance Law of July 11, 1917, P. L. 804, sec. 9, 40 PS §398, providing that if the insurance law be violated the subscriber to the insurance policy issued by a corporation may, at his option, rescind the contract and recover from the company all payments with interest from the time of payment.

It will therefore be seen that the Bedell case represents not an adoption of the United States rule but merely a recognition of the well-established principle that where a company without authority engages in a public business regulated by the State, such as insurance, its contracts are subject to denunciation by the State and, if the statutes so provide, the payments made to it may be recovered back.

In the language of Judge Cunningham, who also wrote the opinion in the companion case of Ruto v. Italian Burial Casket Co., 104 Pa. Superior Ct. 288, 289, "We held that the 'Benefit Bond' involved in the Bedell case was unlawful and void because it was an ultra vires contract of insurance issued in violation of our insurance laws."

It is unnecessary to restate the facts in the instant case, which clearly bring the present controversy within the rule here discussed. The defendant collected the rents of the property, was saved from the foreclosure which would have wiped out its mortgage asset, and having in this manner enriched itself as the result of the agreement, neither law nor equity will permit it now to question the validity of the agreement on the ground that it had no capacity to enter into it.

The defendant has also raised the question that the agreement for the extension of the mortgage constituted an increase of indebtedness within the meaning of the Constitution and the statutes, and that the procedure there ordained was not here followed. The point was not seriously pressed, and we therefore merely observe that it is well settled that every corporation has the right to incur an indebtedness in the ordinary course of its business in order properly to transact its affairs and that this does not constitute the increase of indebtedness contemplated by the Constitution and the statutes. This is expressly ruled in West v. Dyson, 230 Pa. 619, and in the cases there cited.

Defendant also raised the point that the authority of the officers who executed the agreement of extension does not properly appear. The matter was not considered of sufficient importance to be pressed at the argument, and accordingly we dismiss it with the simple statement that the same principle of justice which prevents a corporation from pleading ultra vires after the other party to an agreement has performed it and the corporation has received the benefits of it operates with equal force to estop a corporation from enjoying the fruits of an agreement made by its officers and at the same time setting up their lack of authority as a defense when called upon to perform its part of the bargain: Lemmon v. The East Palestine Rubber Co., 260 Pa. 28.

We have found it necessary to go into this matter at some length because of its great importance and because no opinion appears to have been written on the specific subject in this State. Many cases cited by the defendant we find irrelevant to the question involved. It is sufficient to say of those which have not been specifically noticed that they are either cases which are distinguishable because of varying statutory enactments or are early cases which were decided when the doctrine of ultra vires was in full ascendency or, if later decisions, are by those courts which follow the Federal and not the majority rule which is in force in Pennsylvania.

We find no merit in any of the defenses raised. Accordingly, the rule for judgment is made absolute.